CENTRAL BANK—GRANITE CITY, Guardian of the Estate of Clover Cochran, a Disabled Adult, Plaintiff-Appellee, v. MAHMOUD ZIAEE *et al.*, Defendants-Appellants.

Fifth District   No. 5—88—0431

Opinion filed September 25, 1989.

Morris B. Chapman, of Morris B. Chapman & Associates, Ltd., of Granite City, and Sterling, Kelley & Long, P.C., of Fairview Heights (John Long, of counsel), for appellants.

David L. Antognoli, of Bernard & Davidson, of Granite City, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Defendants, Mahmoud Ziaee and Maryam Ziaee, husband and wife, appeal from a judgment of the circuit court of Madison County for plaintiff Central Bank—Granite City, guardian of the estate of Clover Cochran, a disabled adult, upon a jury verdict for actual damages of $79,700 and punitive damages of $80,000. In this cause, defendants raise the following issues: (1) whether the trial court erred in allowing plaintiff to introduce evidence of the amount of defendants' annual income for the purpose of proving defendants' net worth in connection with plaintiff's prayer for punitive damages; (2) whether the trial court's award of punitive damages constituted double recovery; and (3) whether the trial court erred in admitting into evidence a tape recording of Clover Cochran's statements made on January 7, 1985. This court affirms.

Plaintiff was appointed guardian of the estate of Clover Cochran on January 9, 1985, when Clover was 89 years old. Plaintiff, in its capacity as guardian, originally filed a complaint against defendants in which it sought to have a constructive trust imposed on all land that Clover Cochran had conveyed to defendants. Plaintiff's complaint was later amended to add two additional counts. Count II alleged that the estate was entitled to damages for breach of a fiduciary duty in the amount of the difference between the market value of the assets conveyed to defendants and the consideration received by Clover. Count III alleged that the transfers made during the existence of defendants' fiduciary duty with Clover were induced by defendants' fraudulent representation that they would "attend to her financial affairs, provide her with the necessities of life, and comfortably support and maintain her for the remainder of her natural life." Count III sought both compensatory and punitive damages from defendants.

Defendants first met Clover in the winter of 1978 when she was 82 years of age. Defendant Mahmoud Ziaee was a radiologist on staff at various Alton hospitals. His position required him to maintain a residence in Alton. Dr. Ziaee approached Clover about a potential sale of her real estate, even though her property was not listed or advertised. Clover owned approximately 8.5 acres of land in a rural setting off Route 100, close to Grafton. Defendants had no relatives in the United States, and Clover's family, of which only a few were remaining, were scattered in Kentucky, Georgia and Florida. Clover had been married at one time, but had been divorced for several years and had no children. Defendants, a doctor and a nurse, had two children. Clover and the entire family instantly established a close relationship. By the time the doctor left at the end of their first meeting, he

agreed that he knew Clover's life story. Both defendants and their children began calling Clover "Grandma."

According to Dr. Ziaee, he and Clover agreed on a purchase price for her property within one week of their initial meeting. The doctor was to pay Clover $5,000 with an option to buy the remainder of her property at her death for a price not to exceed $90,000. Defendants would initially have 4.2 acres on which to build their home. An Alton attorney, Charles Godfrey, who had been retained by Clover in 1978, gave a different account of the original agreement between defendants and Clover.

According to Godfrey, Clover had agreed to sell all her land to defendants for $100,000 payable in installments over a five-year period, with Clover reserving a life estate in the portion of the property where her home was situated. Godfrey, however, suggested a different approach in which defendants would make payments, including interest, over a three-year period with a balloon payment at the end. Godfrey spent some time attempting to get a good title description on the land. A meeting was then scheduled between the parties to sign the papers. Godfrey went over the entire contract with the parties. Initially, the doctor seemed to be in agreement, but then stated that he had changed his mind and wanted "to wait another year or two" before proceeding any further with the transaction. Clover seemed surprised by the doctor's announcement. Based on Godfrey's meetings with Clover in 1978, he formed the opinion that Clover's mental ability was somewhat limited at that time. He did not, however, believe that defendants were forcing her into making this agreement.

Approximately three months later, on December 5, 1978, defendants acquired title to roughly 4.2 acres of unimproved real estate from Clover and an option to purchase her remaining land on which her home was located for a price "not to exceed $90,000." Defendants paid Clover $5,000 for the 4.2-acre tract, which at that time had a fair market value of $15,500, according to plaintiff's appraiser at trial. Defendants paid no consideration for the option. A Collinsville attorney, Robert Cadagin, deceased at the time of trial, had been hired by defendants to prepare both the deed and the option. Cadagin originally represented defendants in this suit, but was forced to withdraw due to illness, which ultimately claimed his life. Clover did not have an independent attorney in connection with the transaction.

In March 1980, defendants obtained an additional three–fourths-acre parcel of land to use for their driveway and water line to the house they were constructing. Defendants paid Clover $100 for this conveyance. At trial, plaintiff's expert estimated that this property

had a fair market value of $3,000 at the time of the conveyance. Again, attorney Cadagin prepared the paperwork for this transaction. Clover did not have her own counsel.

In December 1981, another transaction occurred between the parties. At this time, defendants had completed construction on their home. Clover signed an amendment to the option given to defendants in December 1978, whereby the option price on Clover's remaining land was reduced to an amount "not to exceed $70,000." Clover received no money in consideration for this transaction. Defendants and Clover then began what would be the last transaction concerning Clover's real estate.

The final transaction concerned a quit-claim deed of the remainder of Clover's land with a life estate for Clover. Defendants' original attorney in this transaction was Tim Campbell. He believed it would be in Clover's best interest to see a separate attorney who would represent her concerning this transaction. Campbell called another attorney, Robert St. Peters, and asked him to talk to Clover concerning this transaction. Mrs. Ziaee took Clover to consult with St. Peters, but waited in the hallway during Clover and St. Peters' discussion. St. Peters tape-recorded his conversation with Clover concerning her transfer of land to defendants. This tape recording was played for the jury. Based on this recorded conversation, St. Peters concluded that Clover did not have the requisite mental capacity to make such a transfer and, further, did not desire to make such a transfer. Upon finishing his conversation with Clover, St. Peters informed Mrs. Ziaee that the transfer of Clover's land would not occur. According to St. Peters, Mrs. Ziaee became irate and pulled the deed prepared by Tim Campbell out of St. Peters' hands. Mrs. Ziaee then grabbed Clover and shoved her into the Ziaee's Mercedes. St. Peters immediately called Tim Campbell and told him that Clover did not want to transfer her land. St. Peters stated that after he had explained the deed to Clover, she was adamant that she did not want to give the land away. This was corroborated by the tape. St. Peters also sent a letter to Clover expressing his concern that defendants might try to have Clover sign the deed without her knowing what it was. The letter cautioned her not to sign anything without her knowing what it was. This letter was introduced into evidence. On April 12, 1984, Tim Campbell called St. Peters and assured him that defendants would follow Clover's wishes—the transaction would not occur. On April 16, 1984, St. Peters received a follow-up letter to that effect with the unsigned quit-claim deed enclosed. However, on May 15, 1984, defendants acquired the balance of Clover's land by a warranty deed pre-

pared by attorney Cadagin, now deceased. Clover kept a life estate in the remaining property, which was then worth approximately $56,800, according to plaintiff's expert. Attorney St. Peters was not consulted again and had no knowledge of the transaction.

Defendants also acquired several items of personal property from Clover, including a fur coat, a dining room set, a settee, jewelry, a piano, and a 1953 Chrysler New Yorker. Plaintiff's attorney also had in his possession 300 Kentucky Bank shares along with a general power of attorney executed by Clover. Dr. Ziaee testified that he had paid Clover $500 for the automobile and that he performed several repairs on the car. No monetary consideration was given for the remaining items of personal property. However, shortly before the May 1984, final real estate transaction, defendants and Clover signed the following document handwritten by Dr. Ziaee:

> "I Mahmoud Ziaee and my wife Maryam Ziaee will agree to pay all of Ms. Clover Cochran bills, and other expenses (except medical expenses) that she is not able to pay, and do our best to make her life comfortable, and bring someone to clean her house and serve breakfast and dinner, (which has been done for the past four months) if for some reason we go for vacation we make sure someone brings her breakfast and dinner [sic]. In return Ms. Cochran is going to give us her furniture (the ones she does not use now) like her dining room set and china and her piano and whatever she likes to give us whenever she decides (from today January 18, 1984) to give [sic]."

The guardianship proceedings were initiated when Lovetta Beck, a close personal friend of Clover's since the 1950's, called the Regional Guardianship office expressing her concern over Clover's physical and living conditions. Lovetta Beck and Emma Sawyer, another friend of Clover's, went to visit and found Clover's house unkempt with dirty dishes on the table and no food in the refrigerator. There were also many pieces of furniture missing. The bathroom was filthy and littered with used toilet paper. Clover's appearance was also unkempt. Lovetta Beck had seen Clover regularly over the years. She recalled going to lunch with Clover in 1982, and noticing a change in Clover. While Clover's appearance was still good, "her conversation was so disjointed I had a little trouble keeping up with her *** she just wasn't lucid."

Upon receiving the report from Lovetta Beck concerning Clover's well-being, the Regional Guardian administrator, Kay Beuhne, had the Visiting Nurses Association complete an investigation into Clover's welfare. Clover's nephew-in-law in Kentucky was also contacted. Rep-

resentatives of the Visiting Nurses Association came and found the same conditions at Clover's residence as did Lovetta Beck and Emma Sawyer. The house was in disarray. There was only spoiled food in the refrigerator, and the plumbing was not working. A bucket was being used for feces. Clover herself gave the appearance of being malnourished. The Regional Guardian believed that Clover was unable to make decisions concerning her care and her estate. Clover was admitted to the hospital on January 9, 1985, and remained there until February 11, 1985. She was then placed in a nursing home and was still at the nursing home at the time of trial.

Dr. Alejandro Datuin, a board-certified psychiatrist, completed a psychological examination of Clover while she was hospitalized in January 1985. Dr. Datuin diagnosed Clover as suffering from severe senile dementia with psychosis. A CAT scan revealed brain atrophy. According to Dr. Datuin, Clover's condition progressed gradually and had been long-standing. He believed her ability to handle her affairs had been impaired for some time, anywhere from 5 to 10 years prior to the time he examined her.

Two of Clover's relatives testified concerning Clover's failing mental capacity and health. William Ward, age 73, Clover's nephew, visited Clover in 1978 and noticed her mental abilities were impaired. He then talked to Clover weekly or biweekly. These conversations abruptly ended in 1982 when Clover refused to answer the phone. On a subsequent visit in March 1984, Clover's condition had further deteriorated. Clover's person and house were both in deplorable condition. Clover did not recognize him nor his brother-in-law, who also accompanied him. Mr. Ward did acknowledge that he is a potential heir to Clover's estate. He also agreed that after his 1984 visit, he did nothing to aid the ailing Clover. His lack of motivation was attributed to his own failing health.

Linda Tanner, a cousin of Clover's, took care of Clover's sick sister from 1982 to 1985. During this time, Clover's sister would call Clover regularly. In 1984, they began having trouble reaching Clover and called defendants to check on her. They were assured she was fine, but had difficulty hearing the telephone ring. Dr. Ziaee told Ms. Tanner in the latter part of 1984 that Clover no longer wished to have contact with her family, but rather that she now considered the Ziaees her family. Ms. Tanner was later contacted by a friend of Clover's who told her that Dr. Ziaee had told her that Clover had no family. After learning this, Linda Tanner came to visit Clover on January 6, 1985. She gave the same general description of Clover's appearance, physical condition, and living arrangements as did the other plaintiff's witnesses.

During her January visit, Ms. Tanner contacted the Ziaees. She testified that Dr. Ziaee offered to sign over $30,000 of Clover's bank shares to her by using his power of attorney over Clover's property if she would take Clover and never return. When she refused, he told her never to come back to Clover's house. Ms. Tanner did not take Clover back with her as planned because Clover's doctor advised her against it. Ms. Tanner is also a potential heir of Clover's estate.

Defense witnesses testified to the contrary concerning Clover Cochran's mental abilities. Defendants themselves believed that Clover did not suffer any impaired abilities until two weeks before she was removed from her home. There was also testimony by defendants that Clover had feigned mental incompetence during her discussions with attorney St. Peters because she did not trust him.

Mrs. Ziaee testified that Clover had become a member of the family. Mrs. Ziaee cooked breakfast and dinner for Clover, and Clover often ate with defendants at their home. Clover was invited to all defendants' parties and celebrated birthdays with the Ziaee family. Mrs. Ziaee further testified that her husband had refused to allow the family to move back to St. Louis, even though it would have been more convenient to do so, because he had promised Clover that they would not move while she was still alive so that they could take care of her. Mrs. Ziaee also said that she had no control over Clover's person or home from the end of December until the time Clover was removed from her home. During this time, Mrs. Ziaee stated that she would clean Clover's home; however, someone else would come in and mess it up. Soon it came to the point where she was not allowed to come in at all.

Dr. Ziaee testified that Clover was capable until approximately two weeks before she was removed from her home. He also testified to the attention both he and his family had shown to Clover. Specifically, he testified that during the time he had known Clover he had driven her to a family wedding in Kentucky and to visit her sister in Florida because Clover was afraid to fly.

Friends of defendants testified concerning the relationship between defendants and Clover. George Miller, a St. Louis attorney and a friend of the family, visited defendants regularly in Godfrey. He saw Clover during these visits and also called her Grandma. According to Miller, Clover never wanted to leave her home and realized that by having defendants live next door, she would have medical care available and would be able to stay at her home. She wanted defendants to have her land upon her death and had asked Miller if he could draw up papers that would give defendants her land. Miller, who was not

licensed in Illinois, referred Clover to attorney Cadagin. Miller's wife confirmed her husband's testimony concerning the mutually affectionate relationship between defendants and Clover.

Wanda Long, defendants' housekeeper from late 1980 until approximately the end of 1984, testified that she also cleaned Clover's house. She, too, called Clover Grandma. She testified that defendants took good care of Clover. Mrs. Ziaee would cook Clover breakfast and dinner, and Mrs. Long was instructed to do the same if defendants were ever gone. She further testified that she did not meet anyone from the Visiting Nurses Association; however, on rebuttal Barbara Roth of the Visiting Nurses Association testified that the second time she went to see Clover, no one would answer the door. She then went to defendants' home to get help. Wanda Long escorted her back to Clover's home. Wanda Long then told her that she was happy that the Visiting Nurses were assisting Clover and that a housekeeper would be coming. According to Barbara Roth, Long stated she had only been sent to clean Clover's house two times and both times she broke her vacuum sweeper because the house was so filthy. The first time she had been sent because the bathroom facilities were not working and Clover had urinated all over the floor. Long had been sent to clean it up. Also, in rebuttal, plaintiff admitted a tape recording made by Linda Tanner, a relative of Clover's, who had come up from Georgia to check on Clover in January of 1985. The tape was made on January 7, 1985. The recording, consisting of Linda Tanner asking Clover a series of questions, was introduced to prove Clover's mental abilities. It also included Clover cursing defendant, Dr. Ziaee, calling him a liar, and accusing him of taking her property without her consent. Defendants objected to the introduction of the tape.

Defendants' first issue on appeal is whether the trial court erred by allowing plaintiff to introduce evidence of defendants' annual income for the purpose of proving defendants' net worth in connection with plaintiff's prayer for punitive damages. Defendants argue that plaintiff introduced only a scintilla of evidence of defendants' net worth—namely, that defendants had built a house in Godfrey which probably cost more than $350,000, but failed to prove what portion of the value of the house represented defendants' equity therein and that defendants owned a small condominium in St. Louis, the market value of which was not proven nor the amount of defendants' equity therein. Plaintiff then introduced defendants' income tax returns for the years 1982 through 1986. Finally, defendant Dr. Ziaee testified his income for 1986 exceeded $300,000. Defendants argue the jury award of punitive damages in the amount of $80,000 was based not on net

worth, but rather on defendants' income; therefore, the punitive damage award must be reversed.

Plaintiff responds that the evidence of defendants' income may be considered in assessing punitive damages where, as here, defendants failed to comply with the discovery order and plaintiff's Rule 237 (107 Ill. 2d R. 237) request for production of a financial statement or balance sheet. We agree.

In general, punitive damages serve two basic functions: (1) punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future, and (2) punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's acts, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant. (Restatement (Second) of Torts §908 (1979).) Thus, the jury must be informed of the defendants' assets in order to adequately punish defendants. Traditionally, courts have used "net worth" as the method by which to apprise the jury of defendants' wealth. Net worth is defined as the "[r]emainder after deduction of liabilities from assets." Black's Law Dictionary 939 (5th ed. 1979).

It has been held to be error to admit evidence of defendants' net earnings for the purpose of fashioning an award of punitive damages. (*Fopay v. Noveroske* (1975), 31 Ill. App. 3d 182, 334 N.E.2d 79.) However, in *Fopay*, admission of net earnings was held to be error because evidence of net worth had already been introduced. The *Fopay* court found that evidence of net earnings in addition to net worth was wrong because "past earnings are necessarily and inextricably intertwined with *** net worth," particularly "where defendant's 'assets' were purchased from income," and hence, "a real possibility exists of providing the jury with a deceptively high ability to pay." (31 Ill. App. 3d at 200, 334 N.E.2d at 94.) In the same vein, it would be wrong for the jury or a court to assume that defendant will continue to earn at his past rate. However, we are not faced with the same set of circumstances as the *Fopay* court.

In *Fopay*, the defendants had submitted a financial statement disclosing their net worth, which was stipulated to by the parties. In the instant case, there was no such stipulation. In fact, the record reveals defendants had failed to comply with the court's discovery order and a Rule 237 request for production of a financial statement or bal-

ance sheet. Such a distinction was pointed out in *Fopay*, when we stated:

"We are not faced with a situation in which the defendant's assets are in some way indeterminable or concealed. Our approach is the only sound way to balance the need to punish a defendant with the need to avoid imposing an oppressive burden upon him." (31 Ill. App. 3d at 201, 334 N.E.2d at 95.)

Therefore, under the circumstances of the instant case, the court was justified in allowing evidence of defendants' income in connection with plaintiff's prayer for punitive damages. The perceived danger of the jury compounding evidence of net worth with evidence on income in assessing punitive damages was not present. While evidence of net worth is still the preferred method of assessing punitive damages, defendants must be aware that lack of compliance with a court's discovery order can lead to introduction of evidence of net income instead. Moreover, in *Fopay*, the introduction of net income, in addition to evidence of defendants' net worth, was held to be harmless error, as the jury awarded only $20,000, which was well within the defendants' ability to pay. Likewise, in the instant case, the jury award of $80,000 was well within defendants' ability to pay.

We move next to the question whether the award of punitive damages constituted an impermissible double recovery. Defendants argue that in Illinois punitive damages may only be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, wilful conduct, or gross negligence in disregard of the rights of others. (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353.) According to defendants, when a requisite element of the tort itself constitutes these types of conduct, an allowance of punitive damages should be improper. Compensatory damages are adequate to compensate plaintiff for the entire tort, including the elements that constitute bad faith. Plaintiff responds that all fraud does not involve the same degree of misconduct or culpability. The instant case concerns defendants' breach of their fiduciary duty owed to Clover Cochran to an extent which justifies an award of punitive damages. We agree.

■ Punitive damages are not favored and are to be awarded with caution and confined within narrow limits where the wrongful act is accompanied by aggravating circumstances such as wilfulness, wantonness, malice, or oppression so as to warrant imposition as punishment to the wrongdoer and deter the defendant and others from committing like conduct in the future. (*In re Estate of Wernick* (1986), 151 Ill. App. 3d 234, 249, 502 N.E.2d 1146, 1156.) While deceit alone can-

not support a punitive damages award, such damages may be allowed " 'where the wrong involves some violation of duty springing from a relation of trust or confidence, or where the fraud is gross, or the case presents other extraordinary or exceptional circumstances clearly showing malice and wilfulness.' " (*Home Savings & Loan Association v. Schneider* (1985), 108 Ill. 2d 277, 284, 483 N.E.2d 1225, 1228, quoting from *Laughlin v. Hopkinson* (1920), 292 Ill. 80, 89, 126 N.E. 591, 595.) Illinois courts are not hesitant to award punitive damages in cases where there has been a flagrant breach of fiduciary responsibility and clear evidence of fraud. *In re Estate of Wernick* (1986), 151 Ill. App. 3d 234, 502 N.E.2d 1146; *Obermaier v. Obermaier* (1984), 128 Ill. App. 3d 602, 470 N.E.2d 1047.

■ In the instant case, there was substantial evidence of defendants' breach of their fiduciary duty amounting to gross misconduct which justifies the jury award of punitive damages. Defendants, a doctor and a nurse, willingly established a relationship of trust and confidence with an 82-year-old woman without close relatives and who lived in a relatively isolated area. After establishing this relationship with Clover, defendants entered into an ongoing series of profitable transactions which culminated in defendants acquiring for $5,000 all of Clover's real estate, the value of which was approximately $77,000. The most flagrant example of abuse by defendants occurred when they agreed, through their attorney, Tim Campbell, not to make any transactions with Clover in which they would acquire the remainder of her property. Less than one month after this promise was made, defendants broke the promise and completed this transaction through another attorney. In addition, Dr. Ziaee was given power of attorney over Clover, and defendants acquired valuable and sentimental items of Clover's personal property for no consideration except defendants' promise to take care of her.

This promise to take care of Clover, clean her house, and bring her breakfast and dinner was soon discarded after defendants acquired her assets. Clover was found by her friends in a filthy house, without the use of her toilet, with human feces on the floor. She was malnourished and slovenly. The Guardianship and Advocacy Commission immediately intervened upon finding this almost 90-year-old woman in such a state of distress. She was diagnosed as having severe senile dementia, including brain atrophy. The physician who diagnosed her condition opined that this condition had been present for some 5 to 10 years. Yet defendant, a doctor whom Clover trusted and treated as her own son, testified under oath that her condition was good up until two weeks before she was removed from her home. Clo-

ver's condition upon removal from her home had so deteriorated that it warranted a one-month stay in the hospital before she could be placed in a long-term care facility. Such evidence clearly warranted the submission of the issue of punitive damages to the jury and the subsequent imposition of punitive damages.

Defendants cite the case of *Costello v. Capital Cities Communication, Inc.* (1987), 153 Ill. App. 3d 956, 505 N.E.2d 701, *reversed on other grounds* (1988), 125 Ill. 2d 402, 532 N.E.2d 790, which held that where actual malice is the gist of the libel action, both compensatory and punitive damages cannot be recovered. To allow both would constitute a double recovery. This holding is not applicable to situations such as the one before us. A libel action is clearly distinguishable from an action for breach of a fiduciary duty. Defendants' argument that the award of punitive damages constituted an impermissible double recovery is without merit. We cannot think of a situation more deserving of an award of punitive damages than the case at bar in order not only to punish defendants, but also to deter others who might consider duping a senile and lonely octogenarian.

We move now to the final issue, whether the trial court erred by admitting into evidence the second tape recording of Clover Cochran's statements made on January 7, 1985, by Linda Tanner. Defendants argue that it was prejudicial error to allow the introduction of this second tape into evidence because there was a strong likelihood that the jury would take as true Clover's accusations against defendant Dr. Ziaee, as compared to the slight usefulness of the statements as proof of Clover Cochran's mental capacity. Plaintiff responds that defendants failed to properly object to the tape's admission, having thereby waived the argument that the probative value is outweighed by the tape's prejudicial effect. We agree.

■■ ■ Where grounds of an objection to admission of testimony have not been included in the objection entered at trial, such grounds ordinarily will not be considered on appeal. (*Pyse v. Byrd* (1983), 115 Ill. App. 3d 1003, 1007, 450 N.E.2d 1374, 1376.) A review of the record indicates that the defense attorney argued against the tape's admission on the grounds that: (1) the tape was not proper rebuttal; (2) the conversation was made in contemplation of litigation and, therefore, incompetent; and (3) Linda Tanner, whose testimony was required to lay the foundation for the tape, was precluded from testifying because of her presence in the courtroom at earlier stages in the trial. Defense counsel did not argue that the tape recording was unduly prejudicial. Therefore, defendants waived this argument. The waiver rule is appropriate in the instant case because had defendants

timely interposed the objection, the alleged prejudicial effect of the tape could have been avoided by either cutting those portions of the tape defendants claimed were unflattering or by giving a limiting instruction advising the jury to consider the recording only for purposes of determining Clover's mental condition. Assuming, *arguendo*, that defendants had objected at trial on the grounds that the tape's probative value was outweighed by its prejudicial effect, we find the tape would still have been admissible.

■■ Tape recordings are generally admissible to the same extent as a witness who heard the statement. (*Belfield v. Coop* (1956), 8 Ill. 2d 293, 304, 134 N.E.2d 249, 254; *People v. McCommon* (1979), 79 Ill. App. 3d 853, 866, 399 N.E.2d 224, 234.) More importantly, statements disclosing a mental condition existing at times both before and after the making of a will are relevant if accompanied by medical evidence that the condition was both continuing and progressive. (*In re Estate of Berry* (1988), 170 Ill. App. 3d 454, 524 N.E.2d 689.) While we are not dealing with a will contest, the same reasoning can apply to the instant case.

■■ As explained in the 1941 case of *Peters v. Peters* (1941), 376 Ill. 237, 33 N.E.2d 425, "[p]roof of the mental condition of the testator a reasonable time before or after the making of a will may be received where it tends to show mental condition at the time of the execution of the instrument. A mental condition shown to exist is presumed to continue, if it be of a continuous nature." (376 Ill. at 243, 33 N.E.2d at 427.) Moreover, a trial court has substantial discretion to determine the time frame within which events concerning the testator are relevant to the capacity of the decedent in a will contest suit. (*In re Estate of Berry* (1988), 170 Ill. App. 3d 454, 524 N.E.2d 689.) With this in mind, we cannot say that the trial court abused its discretion in allowing into evidence the second tape.

The January 7, 1985, tape recording did indicate that Clover was suffering from advanced senility. Her thoughts wandered and she incessantly rambled. She also made a number of references that her parents were still alive and that she regularly used a horse and buggy as transportation. The tape recording supported Dr. Datuin's opinion that Clover's condition was long-standing and progressive, and not, as defendants argued, of recent origin. The second tape also allowed the jury to compare Clover's condition from the time the first tape was made 10 months prior to the second recording. The jury was able to determine whether Clover's mental condition had diminished over this 10-month period.

Defendants further argue that the second tape was cumulative

950

and should not have been allowed into evidence. However, we find that the tape was admissible to refute defendants' argument that Clover feigned incompetence during the first recording made by attorney St. Peters. We are also unconvinced by the cases cited by defendants to support their contention that the second tape was inadmissible. In *People v. Johnson* (1979), 68 Ill. App. 3d 836, 386 N.E.2d 642, admission of hearsay evidence by the arresting officer that a patron at the store that was robbed had identified the defendant at a face-to-face confrontation was held to be error requiring reversal. In *Johnson*, the hearsay evidence was inadmissible even for the limited purpose for which it was offered, which was to explain the officer's investigatory procedure. Even though it was offered for a limited purpose, it was reemphasized by two other witnesses other than the officer and argued by the prosecutor during closing argument as a positive identification of the defendant. In the instant case, the second tape recording was admissible to prove diminished mental capacity, and there was no argument by plaintiff that the tape recording should be used to prove that defendant Dr. Ziaee was a liar and had taken Clover's property against her will.

Likewise, In *People v. Escobar* (1979), 77 Ill. App. 3d 169, 395 N.E.2d 1028, the prejudicial effect of the disputed evidence which was offered for a limited purpose arose from an argument that the evidence should be used for a purpose other than for which it was admitted. Again, in the instant case there was not such improper argument. The trial court was within his discretion to admit the second tape. A limiting instruction may have been appropriate; however, defendants did not ask for such an instruction, and we cannot say that without such an instruction, the admission of the tape was so unduly prejudicial to defendants that reversal is required.

For the foregoing reasons, the judgment of the circuit court of Madison County is hereby affirmed.

Affirmed.

WELCH, P.J., and HOWERTON,* J., concur.

*After the case was taken under advisement, Justice Howerton was assigned to the panel in substitution of Justice Rarick, who recused himself.