**Tina JOHNSON, et al., Plaintiffs,**

v.

**William SMITH, et al., Defendants.**

**No. 92 C 5495.**

United States District Court,
N.D. Illinois,
Eastern Division.

June 15, 1995.

Order Denying Post–Judgement
Motions July 24, 1995.

James Ferguson and Richard Hoffman, Sonnenschein Nath and Rosenthal; Elizabeth Shuman–Moore, Chicago Lawyers Committee for Civil Rights Under Law, Chicago, IL, for plaintiffs.

Marshall Kaplan and Jeff Arshonsky, Chicago, IL, for defendants.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

■ This Court's March 8, 1995 memorandum opinion and order ("Opinion II," *Johnson v. Smith*, 878 F.Supp. 1150 [1]) granted summary judgment in favor of several members of the Johnson family (collectively "Johnsons") on their claims against remain-

ing nondefaulted defendants William Smith ("Smith"), Brian Emberton ("Brian") and David and Julia Emberton (collectively "Brian's Parents") stemming from the outrageous incident summarized in Opinion II at 1152:

> On August 15, 1990 Smith and Brian, together with other defendants in this action, burned a cross in Johnsons' yard and threw a brick through the window of their residence. Those intentional acts were committed solely because Johnsons (other than Tina Johnson) are African–American and because Smith, Brian and the others wanted to drive Johnsons out of the Smith–Emberton neighborhood (which had been predominantly occupied by white persons before Johnsons moved in).
>
> That outrageous conduct was both humiliating and intimidating to Johnsons. Steve and Tracy Johnson have already moved out of the neighborhood as a direct consequence of the cross-burning incident, and Tina Johnson is now planning to move out of the neighborhood for the same reason.

At the ensuing May 1 and 2, 1995 hearing on the issue of damages ("Hearing"), both Smith on the one hand and Brian and Brian's Parents on the other were represented by counsel, and Smith and Brian testified. Although the Hearing also constituted a proveup as to the damages awardable against previously defaulted defendant Kevin O'Brien ("O'Brien"), he did not appear either personally or through counsel.

At the conclusion of the Hearing this Court requested that the several counsel provide memoranda setting out their respective theories and authorities as to the quantification of Johnsons' damages. Counsel for Johnsons and Smith have done so, but the lawyer for Brian and Brian's Parents has not.[2] This memorandum opinion and order

1. References to Opinion II in this opinion will take the form "Opinion II at —," listing the page number but not repeating the volume number in F.Supp. This opinion employs the "Opinion II" description because that ruling had itself used the term "Opinion" to refer to this Court's earlier opinion in this case, 810 F.Supp. 235 (N.D.Ill. 1992).

2. This Court's law clerk made a follow-up inquiry of the latter counsel after the memorandum was already overdue, and after some further delay counsel reported that he had located relevant authority and would file his submission within a few days. That elapsed time interval is now measurable in weeks rather than days, but nothing has been forthcoming.

will deal with the award of damages against all remaining defendants.[3]

What is at issue here are primarily (though not exclusively) intangible harms rather than out-of-pocket damages. In the area of housing discrimination, when dealing with defendants' refusals to rent or to sell on race-discriminatory or color-discriminatory grounds, our Court of Appeals has often reduced the awards for such damages substantially. On one occasion it has thrown cold water on a $12,000 award that it upheld, saying that it was "very close to being excessive" (*Hamilton v. Svatik*, 779 F.2d 383, 389 (7th Cir.1985)).

As limiting as those rulings have been—and this Court is of course bound to and does follow that lead (see its opinion in *Rodriguez v. Gattuso*, 795 F.Supp. 860, 864, 866 (N.D.Ill.1992), discussing and applying the decisions in *Hamilton, Phillips v. Hunter Trails Community Ass'n*, 685 F.2d 184, 190–91 (7th Cir.1982) and *Douglas v. Metro Rental Servs., Inc.*, 827 F.2d 252, 256–57 (7th Cir.1987))—it should be recognized that cross-burning is conduct of a substantially different order than the refusals to deal dealt with in those earlier cases. It inevitably calls up for everyone—but obviously most particularly for black citizens—images of the depredations of the Ku Klux Klan, which inspired and gave its nefarious name to one of the federal statutes under which Johnsons sue. Moreover, the feelings (serious though they are) caused by race-based refusals to deal in the housing market must pale beside the terror and other emotional distress naturally induced by being awakened in the middle of the night by a cross-burning on one's lawn and a brick through one's window. This Court accordingly holds that the appropriate outer limit for compensatory damages attributable to the egregious conduct at issue here should be at least twice that suggested by the language in *Hamilton*, or the sum of $30,000 per plaintiff.

This Court heard the testimony of the individual plaintiffs and found it entirely credible as to the mental and emotional distress that has been visited on them. Although Tina Johnson is not herself black, she had been required by force of circumstances to live in an essentially all black public housing project with her then husband (who was black) and their children until they accumulated enough money to better their circumstances by acquiring the residential property where defendants then terrorized them. Though she may not have been the most articulate of witnesses (she was foreign born, and English is not her first language), she more than adequately reflected the still-suffered effects of defendants' conduct. It is not accurate to urge, as Smith Mem. 3–4 does in speaking of Tina Johnson, that such harm must be supported by expert testimony and that the testimony of an injured plaintiff is not enough. Nor is it necessary for a plaintiff to have sought professional help to deal with those effects of defendants' misconduct. Each of the other testifying plaintiffs also described the effects on him or her adequately and persuasively. With those general statements of the principles applicable to all plaintiffs, this opinion turns to the task at hand.

In terms of the facts developed at the Hearing, once again Johnsons' counsel (as was true of their factual statement in support of an order of summary judgment as to liability, Opinion II at 1153–56) have provided a wholly accurate summary of the testimony. Accordingly this Court finds the facts in accordance with the attached *Factual Background* section taken from Johnsons' post-Hearing memorandum (except for the concluding paragraph of that memorandum as to the requested damages).

As for the damages to be awarded to the Johnsons by reason of those facts, this Court finds, consistently with the principles already stated in this opinion:

> 1. Judgment is ordered to be entered in favor of Tina Johnson (a) as compensatory damages, jointly and severally against O'Brien, Smith, Brian and Brian's Parents

---

**3.** This Court's current review of the case docket discloses one defendant, William Glowacki, who has not been covered by an order of disposition. Based on this Court's January 28, 1994 order and Johnsons' failure to have reported service on that defendant, he is dismissed under Fed. R.Civ.P. 4(m).

in the sum of $30,000 for intangible harms plus $167 for property damage (⅓ of the $500 total) and $1,400 in lost income (one month away from work), for a total of $31,567, and (b) as punitive damages, the sum of $30,000 against O'Brien,[4] $25,000 against Smith[5] and $5,000 against Brian.[6]

2. Judgment is ordered to be entered in favor of Tracy Johnson (a) as compensatory damages, jointly and severally against O'Brien, Smith, Brian and Brian's Parents in the sum of $18,000 for intangible harms plus $1,250 in lost income (two weeks away from work), or a total of $19,250, and (b) as punitive damages, the sum of $18,000 against O'Brien, $15,000 against Smith and $3,000 against Brian.

3. Judgment is ordered to be entered in favor of Steven Johnson (a) as compensatory damages, jointly and severally against O'Brien, Smith, Brian and Brian's Parents in the sum of $18,000 for intangible harms plus $167 for property damage (⅓ of the total), or a total of $18,167,[7] and (b) as punitive damages the sum of $18,000 against O'Brien, $15,000 against Smith and $3,000 against Brian.

4. Judgment is ordered to be entered in favor of Rose Johnson (a) as compensatory damages, jointly and severally against O'Brien, Smith, Brian and Brian's Parents in the sum of $18,000 for intangible harms plus $167 for property damages (⅓ of the total), or a total of $18,167,[8] and (b) as punitive damages the sum of $18,000 against O'Brien, $15,000 against Smith and $3,000 against Brian.

Because all claims against all defendants have now been resolved, this is the final judgment order in this action.[9]

## FACTUAL BACKGROUND

Both Rose and Tina Johnson testified that the Johnsons spent their early years in the Chicago Housing Authority's Dearborn Homes project. (Transcript of May 1–2, 1995 damages hearing ["Tr."], pp. 59–60, 105–07.) Because of their race, the Johnsons were subjected to repeated harassment—both verbal and physical—in the Dearborn Homes. (Tr. 105–06.) Nevertheless, Tina Johnson and her former husband taught their children not to be prejudiced or to judge people based upon their race. (Tr. 107–08.)

The Johnsons worked their way out of the Dearborn Homes, initially renting a series of apartments on Chicago's near northwest side. (Tr. 107–09.) In this racially integrated environment, the Johnsons were able to escape the racial hostility they had experienced in the Dearborn Homes. (Tr. 144–45.) In 1985, Tina, Steve and Rose Johnson bought into the American dream by purchasing the family's first home at 2225 West Cullom (the "Property"). (Tr. 58–59, 105, 109, 133.) The Johnsons testified that they got along well with their neighbors, and did

4. O'Brien's default has effectively precluded this Court from making any determination that would temper the otherwise appropriate entry of punitive damages awards against him equal to the intangible harm portion of the compensatory damages awards against him. Clearly he was the ringleader in instigating the cross-burning, and such punitive damages awards are moderate under the circumstances.

5. Smith ran O'Brien a close second in terms of culpability, and he aggravated matters by his false testimony in which he attempted to minimize his involvement. Although Smith's testimony disclosed him to have been a total idler and wastrel until now, nothing appears to prevent him from becoming gainfully employed. This Court has taken that into account in setting the punitive damage awards against him.

6. Even though Brian was the brick-thrower, his testimony (and the nature of his immediately-post-offense behavior, including his prompt apology after he had sobered up) disclosed him to be less culpable in the offense and suggested that it was really an aberration on his part (totally out of character with his responsible conduct since then). Although punitive damages are in order against him, the much more moderate awards reflected in this opinion have taken those mitigating factors into account.

7. Although Steven Johnson testified to time away from work, he offered no testimony that quantified that element of damages.

8. What has been said as to Steven Johnson is also true of Rose Johnson.

9. Because no proof of damages on the part of remaining plaintiff Jilda Johnson Lewis was offered, no award is made in her favor.

not experience any racial hostility. (Tr. 48, 67–68, 125, 149.) However, all of that came to an end on the morning of August 15, 1990, when the Defendants burned a cross in the Johnsons' yard, and threw a brick through Tina Johnson's window.

Each of the Johnsons testified about the serious impact the cross burning had on them and their family. Tina Johnson testified that she became fearful, not only for herself, but also for her family, and in particular her son Victor. (Tr. 62–63.) Tina remains fearful to this day. (Tr. 64–65.) As a result, Tina has had to take a cab to work every morning to avoid walking to the bus in the dark. (*Id.*) Moreover, as a result of the Defendants' conduct, Tina, Rose and Steve are trying to sell the Property so Tina can move out of the neighborhood. (Tr. 67.) Tina also testified that Victor remains afraid to stay home alone as a result of the cross burning, and that she therefore gets to spend less time with her son. (Tr. 68.)

Tracy Johnson testified that she was also afraid after the cross burning, and is still afraid when she goes back to the Property to visit family and friends. As a result, she does not go back often. (Tr. 19–22.) More importantly, Tracy testified that she and Steve moved out of the neighborhood as a direct result of the Defendants' conduct, incurring substantial costs. (Tr. 22–24.) She and Steve were starting a family, and did not want to raise a child in a dangerous and racially hostile atmosphere. (Tr. 23, 54–55.)

Steve Johnson confirmed Tracy's testimony regarding their decision to leave the neighborhood as a result of the cross burning. (Tr. 138–39.) He also testified about his own concern and fear for his family's safety. (Tr. 135.) In fact, while on patrol as a Chicago police officer, Steve went off his beat just to drive past the Property and make sure his family was okay. (Tr. 137.) Steve also testified that he has been stigmatized by the incident, and that he still thinks about the cross burning on a regular basis. (Tr. 136, 138.)

Rose Johnson testified about the family's difficult history coming out of the Dearborn Homes. (Tr. 105–07.) She also testified about the impact the cross burning had upon her; how she was hurt and became fearful living on the Property, where she still resides today. (Tr. 110–112.) She also testified that she felt hurt for Tina, who had endured so much in the Dearborn Homes. (Tr. 111.)

Finally, the Johnsons testified about the acts of violence which the family has experienced since the cross burning. Tracy testified that the family dogs were murdered. (Tr. 47.) Steve testified that white youths pointed a gun at him while he was mowing the lawn. (Tr. 138.) Rose testified that her cable TV wires and telephone lines were cut. (Tr. 112.) Both Tracy and Rose testified that their cars were vandalized. (Tr. 45, 112.) And the Johnsons testified about the graffiti painted on the coach house. (Tr. 45, 69, 112.) Nothing like this occurred prior to the cross burning. (Tr. 112.)

To compensate them for their emotional pain, for the havoc wrought upon their lives, and the expenses they have incurred, plaintiffs have asked the Court to award compensatory damages in the amount of at least $100,000 to Tina Johnson and $50,000 each to Tracy, Steve and Rose Johnson. In addition, Plaintiffs have asked the Court to award punitive damages in the amount of $100,000 against Kevin O'Brien and $75,000 each against William Smith and Brian Emberton to punish them and to deter them and others from engaging in such conduct in the future.

### MEMORANDUM OPINION AND ORDER ON POST-JUDGMENT MOTIONS

On June 15, 1995 this Court issued its memorandum opinion and order ("Opinion III") directing the entry of final judgment in favor of several members of the Johnson family (collectively "Johnsons") against the remaining defendants in this action.[1] On June 26 one of those defendants, William

---

**1.** As Opinion III, op. at 727 n. 1 reflects, this Court's original "Opinion" is reported at 810 F.Supp. 235 (N.D.Ill.1992), while "Opinion II" (granting summary judgment as to liability as to the then-remaining four nondefaulted defendants) is reported at 878 F.Supp. 1150 (N.D.Ill. 1995).

Smith ("Smith"), filed two timely post-judgment motions:

1. a Fed.R.Civ.P. ("Rule") 59(e) motion to alter or amend the judgment against Smith and

2. a Rule 59(a)(2) and 59(b) motion for a new trial on the issue of damages payable by Smith.

This ruling on those motions has been delayed somewhat, not by any substantive difficulties that have been posed by Smith's contentions (none of which, on analysis, possesses any merit) but rather by the fact that this Court has been away for a brief vacation and has since then been occupied in catching up on other matters accumulated during its absence.

As for the Rule 59(e) motion, it mischaracterizes both the holdings in Opinion III and the relevance to this case of the evidence presented during the damages hearing:

1. For example, Johnsons' background life in a public housing ghetto environment before they moved to the neighborhood occupied by Smith and his fellow culprits is highly relevant, not on any notion that the earlier life was "caused" by Smith and his cohorts (Motion at 2)—of course it was not—but rather because of the contrast between that earlier environment and the relatively upscale neighborhood that Johnsons were living in when Smith and the others terrorized them by a cross-burning and by throwing a brick through Johnsons' window. That made all the more poignant the cruelty that Smith and his colleagues engaged in by destroying the security of that new environment.

2. As for the post-cross-burning conduct by persons other than Smith and his codefendants, Smith's counsel falsely ascribes notions of judicial emotion and of using that conduct in the assessment of Johnsons' damages, just because those matters were referred to in evidence. Those later episodes did help to keep the cross-burning by Smith and his cohorts fresh in Johnsons' minds, but in setting the compensatory and punitive damages in this case this Court considered *only* defendants' conduct.

3. As for the assessment of punitive damages against Smith, this Court rejects the restriction that is urged by Smith's counsel in reliance on *Fopay v. Noveroske,* 31 Ill.App.3d 182, 199–201, 334 N.E.2d 79, 93–94 (5th Dist.1975). *Fopay, id.* itself recognized that "other jurisdictions have not accepted this approach," and since then the Fifth District (which decided *Fopay* ) has approved the consideration of earning capacity as well as net worth in setting punitive damages (*Central Bank–Granite City v. Ziaee,* 188 Ill.App.3d 936, 944–46, 136 Ill.Dec. 346, 352–53, 544 N.E.2d 1121, 1127–28 (5th Dist.1989)). And quite apart from the fact that just two Fifth District cases are scarcely a definitive statement even of Illinois law, what is surely most significant is that Illinois state law does not control in this Section 1983 action anyway (*Littlefield v. McGuffey,* 954 F.2d 1337, 1349 (7th Cir.1992))—and Johnson's counsel adduces nothing to suggest that the unusual *Fopay* decision reflects federal law. Indeed, such cases as *Tolliver v. Amici,* 800 F.2d 149, 151 (7th Cir. 1986) suggest the propriety of considering income as well as net worth for punitive damages purposes. This Court simply declines to apply a doctrine that would reward Smith for "hav[ing] been a total idler and wastrel until now" (Opinion III, op. at 729 n. 5).

It is unnecessary to deal in any further detail with Smith's motion—suffice it to say that it is entirely without merit and is denied.

As for Smith's Rule 59(a)(2) and 59(b) motion for a new trial, Smith's counsel attempts to support it by merely repeating what he has said in the other motion. Nothing that he offers suggests any predicate for retrying the case on damages. That motion too is denied.