(text box: 1) NO. 5-00-0505

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____________________________________________________________________________________________

MARGUERITE A. O'NEILL, )  Appeal from the

)  Circuit Court of

     Plaintiff-Appellee, )  Madison County.

)

)  No. 98-L-697

)

GALLANT INSURANCE COMPANY, )  Honorable

)  George J. Moran,

     Defendant-Appellant. )  Judge, presiding.

_____________________________________________________________________________________________

JUSTICE KUEHN delivered the opinion of the court:

In this case, an insurance company took its small stake in the outcome of a personal-injury claim, $20,000 worth of liability coverage purchased by one of its customers, and transformed it into a multimillion-dollar judgment against the carrier.  For reasons that are not entirely clear, John Moss, executive vice president of Warrior Insurance Group
(footnote: 1), the person primarily responsible for this action, bypassed a chance to settle an insured's obvious liability for catastrophic personal injuries, and to do so within the insurance policy limits.  His decision turned $20,000 worth of contractual duty into a $3,010,063 judgment for a bad-faith refusal to settle within the policy limits.     

This remarkable wizardry had its origins on October 31, 1996.  On that Halloween day, a Gallant Insurance Company customer named Christine Narvaez drove her insured automobile onto the parking lot of a busy Granite City supermarket.  Christine had her two-year-old grandchild with her.  The youngster was riding, unconstrained, in a booster seat.  Christine saw a friend and decided to stop for a brief chat.  She parked and exited the car, leaving the keys in the ignition and the motor running.  Thus, circumstances awaited the mischief that her unattended two-year-old grandchild could glean from being left alone in a car with its engine running.     

Gallant Insurance Company's insured played quite a Halloween trick on shoppers in the vicinity of her car.  The trick treated Marguerite O'Neill to lifelong confinement in a nursing home.  It only took a moment for Christine's little nipper to crawl behind the wheel, slip the car into gear, and set it into motion.  As the car rolled out of control, it collided with two other cars and two pedestrians.  Mrs. O'Neill was the most severely damaged victim of Christine's negligence. 

Mrs. O'Neill was in her eighties and could not physically evade the slow-moving car as it approached her.  The insured's vehicle pinned her between it and another car and slowly crushed her trapped body.  Mrs. O'Neill was pried loose and airlifted to St. Louis University Hospital Trauma Center, where she spent the next month in the intensive care unit.  Her body suffered a crushed hip, a broken arm, four cracked ribs, and two fractured fingers.  She lost more than 40% of her blood supply as a result of internal bleeding.  The blood loss triggered respiratory shock.  Mrs. O'Neill was given a tracheotomy and was placed on a respirator for 24 days.  

The accident had lasting consequences.  It deprived Mrs. O'Neill of the ability to live life independently of others.  It placed her into a nursing home, where she remains to this day. 

Gallant Insurance Company (Gallant) insured Christine with the statutory minimum amount of coverage against liability arising out of the operation of her car.  Consequently, there was only $20,000 worth of coverage to address the catastrophic damages that Christine's negligence wrought.  Not including her other damages, Mrs. O'Neill's medical bills amounted to $105,000.

Mrs. O'Neill's attorney demanded the policy limits in settlement of her claim.  He offered a 
complete release from liability for Christine
, provided that Gallant would promptly tender its check for Christine's $20,000 liability coverage.  Gallant was given 30 days to decide.  Confronted with a case of obvious liability with potential damages far in excess of the policy limits, 
Gallant did not dignify the demand with a response
.  The 30 days passed and Gallant remained silent.  It did not try to negotiate.  It did not attempt a counteroffer.  It did not even tell Christine that the elderly lady that she hurt was willing to forego a personal judgment for more than the amount with which Christine was insured.  Gallant simply ignored the offer to settle, and a window of opportunity to protect its customer from an excess judgment closed. 

Moss bypassed the chance to authorize the payment of the coverage that Christine had purchased from Gallant.  As a result of his decision, Christine suffered a large excess judgment.  Gallant's refusal to even respond to an invitation for settlement occurred under baffling circumstances.

Gallant's initial adjuster noted in the claims diary that Christine was clearly negligent and that Gallant was responsible for the damages that she caused.  His opinion was reviewed by an immediate supervisor and a claims director, and both concurred in his liability evaluation.  Based upon that opinion, Gallant paid the two property-damage claims that stemmed from the accident.  When Mrs. O'Neill registered her claim through a lawyer, the claim was forwarded to a more seasoned adjuster.  She examined her younger counterpart's work, conducted her own independent investigation of the claim, and 
before a demand was even made
, recommended the payment of the $20,000 policy limits.  A claims manager reviewed this recommendation.  She wrote to Moss and conveyed her opinion that the policy limits should be tendered.  

Gallant did not have a claims department.  It was one of two subsidiaries of Warrior Insurance Group, the company that handled all claims.  Moss was the executive vice president of Warrior Insurance Group (Warrior).  None of Warrior's 12 claims adjusters had the authority to settle a claim for $20,000.  Warrior's two claims directors lacked such authority.  Even Warrior's claims manager could not authorize a $20,000 settlement.  
Only
 
Moss and Warrior's chief executive officer could authorize any Gallant settlement payment in excess of $15,000
.

Warrior's claims manager, someone with a decidedly conservative approach to the settlement of automobile liability claims, wrote and advised Moss that the tender of the policy limits was a necessary step "in order to make sure that the policyholder's interests were treated with equal weight as the company's interests."  

Moss also heard from the lawyers Gallant hired to defend against Mrs. O'Neill's lawsuit.  At the time, Gallant so valued their work that it had the firm handling 500 active files, all on a flat-fee billing basis.  Two weeks prior to the settlement demand's expiration, those lawyers wrote to Moss with an evaluation and a recommendation.  Christine's lawyers told him that 
liability was clear
.  They also told him that the 
verdict potential
 on that obvious liability rested within a dollar range 
15 to 30 times the amount of coverage
.  Two weeks before the chance to settle within the policy limits was forever lost, Christine's lawyers urged Moss to tender those limits.  In their professional judgment, it was clearly the prudent thing to do.  

Moss decided to reject everyone's advice
.  His decision to disregard the adjusters' opinions, the director's opinion, his claims manager's opinion, and Christine's lawyers' opinions occurred without explanation or notation in the claims diary.  Much later, at the trial of this case, Moss's testimony, the linchpin of the defense against the bad-faith claim, revealed the reason behind the decision.  Moss actually testified, under oath, that he believed in good faith that Christine was not liable for anyone's injuries.

Almost a year after the demand to settle for the policy limits had expired, and only a few days before the trial on the underlying personal-injury action was to begin, Moss decided to authorize an offer of $20,000 in order to settle the case.  By that time, Mrs. O'Neill had no interest in accepting such an offer.  She had incurred more than $3,000 in costs readying the case for a trial, and there was no offer to defray them.  Mrs. O'Neill's economic losses as a result of the accident had nearly doubled since the demand expired, and her contingency-fee structure had also increased.  On the eve of trial, Mrs. O'Neill was intent on seeing what kind of an award a jury would return.  Hopefully, Christine would personally satisfy the amount by which the jury's award might exceed Christine's insurance coverage.

Moss preferred a last-minute offer of the policy limits to a jury test of his good-faith belief that liability was lacking.  Unfortunately, he made the decision to forego his belief too late.  The chance to obtain a release in return for $20,000 had come and gone.

A few days after Mrs. O'Neill's refusal of Gallant's offer, a jury found for her and against Christine and awarded $731,063 in damages.  The verdict came as no surprise to anyone in Gallant who was ever entrusted with the task of evaluating the claim.  We are not even sure that it surprised Moss.  Gallant's lawyers asked him to send a $20,000 company check, and he complied, before the verdict was even returned.  Christine owed Mrs. O'Neill $711,063.  The only reason that she owed it was her carrier's decision not to meet the demand for the policy limits.  Moss's good-faith belief that there was no liability on Christine's part proved to be misplaced.  The mistake resulted in Christine's financial ruin.

A supplementary action was commenced in order to enforce the judgment against Christine.  Her potential claim against Gallant for its failure to settle Mrs. O'Neill's claim within the policy limits was assigned to Mrs. O'Neill, who then brought this lawsuit against Gallant.  The case was tried to a jury.  The jury found in Mrs. O'Neill's favor and awarded actual damages in the sum of $710,063
(footnote: 2) and punitive damages in the sum of $2.3 million.  Interest was also awarded.

A significant part of the evidence presented against Gallant consisted of the pattern of conduct engaged in by Gallant over the five years leading up to this bad-faith action.  Mrs. O'Neill presented 44 known cases where Gallant's Illinois customers suffered excess judgments after Gallant passed up the opportunity to settle within the policy limits.  Most of the excess judgments occurred on John Moss's watch.  The dollar amount by which the excess judgments exceeded policy limits totaled 
$10,849,313
.  This staggering total was accumulated through jury awards on automobile accident cases, a class of personal injury generally known for miserly jury verdicts.  All but $449,313 of this amount was awarded 
after Moss took over
 control of the settlement process in June of 1997.

Gallant argues that the jury's verdict, based upon the finding that Gallant acted in bad faith in its handling of Mrs. O'Neill's claim, is contrary to the manifest weight of the evidence.  This is a question that we review with deference to the jury.  Its findings will not be overturned unless they are "manifestly erroneous."  
Fritzsche v. Union Pacific R.R. Co.
, 303 Ill. App. 3d 276, 287, 707 N.E.2d 721, 729 (1999).

Where an insurer is pursued for its refusal to settle a claim, "bad faith" lies in an insurer's failure to give at least equal consideration to the insured's interests when the insurer arrives at a decision on whether to settle the claim.  See 
Mid-America Bank & Trust Co. v. Commercial Union Insurance Co.
, 224 Ill. App. 3d 1083, 1087, 587 N.E.2d 81, 84 (1992).  This is precisely the standard set forth by Donna Hedl, Warrior's claims manager, when she wrote Moss and gave her opinion of how Mrs. O'Neill's claim should be handled.  She wrote that the policy limits should be tendered "in order to make sure that the policyholder's interests were treated with equal weight as the company's interests."  Her admission, standing alone, provides ample evidence of bad faith.  However, there was other evidence of bad faith to support the jury's verdict.  

We have identified seven factors pertinent to the assessment of bad faith, and every one of them supports this jury's verdict.

I.

The advice of the insurance company's own adjusters is a factor to be considered.  See 
Phelan v. State Farm Mutual Automobile Insurance Co.
, 114 Ill. App. 3d 96, 104-05, 448 N.E.2d 579, 585 (1983).

Moss, Gallant's decision-maker and the only one authorized to advance a settlement offer in this case, was urged by every level of claims department employee to tender the policy limits.  The claim's initial adjuster, his supervisor, and a claims director all concurred in their evaluation of the insured's liability.  As a consequence, Gallant paid the property-damage claims in full within 30 days of the occurrence.

The next adjuster who reviewed the file concurred in the conclusions already reached by three other claims department employees.  She recommended the payment of the policy limits before Mrs. O'Neill even made a demand.  Her supervisor, the claims manager, also recommended the payment of the policy limits.  Her recommendation was particularly damaging to Gallant.  

Donna Hedl had adjusted claims for Gallant and other nonstandard insurance companies for more than 25 years.  Historically, she conceded the payment of claims grudgingly.  She subscribed to the conservative philosophy that no claim should be paid absent clear negligence on the part of the insured.  Moss had to admit at the trial that he appreciated how she employed this philosophy and that she served the company well.  He found her to be a most able and competent adjuster.  This left little to offer in support of why he would not follow her advice and tender the policy limits. 

II.

A refusal to negotiate is a factor to be considered.  
Cernocky v. Indemnity Insurance Co. of North America
, 69 Ill. App. 2d 196, 208, 216 N.E.2d 198, 205 (1966).

Mrs. O'Neill's attorney wrote to Gallant with a firm offer to settle for $20,000.  Gallant did not respond.  It did not make a counteroffer, request more time to evaluate the demand, or even dignify the attempt to settle with the courtesy of an answer.  Donna Hedl admitted that a timely response to a policy-limits demand, even if it is a rejection of the demand, is of critical importance.  It keeps open the lines of communication toward compromise and settlement.

III.

The advice of defense counsel is a factor to be considered.  
Olympia Fields Country Club v. Bankers Indemnity Insurance Co.
, 325 Ill. App. 649, 674-75, 60 N.E.2d 896, 906-07 (1945).

At a time when Mrs. O'Neill's policy-limits demand remained open, Christine's lawyers advised Moss of their professional opinion that Christine would be held civilly liable for Mrs. O'Neill's damages.  The lawyers whom Gallant hired to champion Christine's defense gave Moss this evaluation, together with their estimate that the verdict range would likely fall between $300,000 and $600,000.  Christine's lawyers urged a settlement for the policy limits two weeks before Mrs. O'Neill's offer expired.  The attorneys would later increase the verdict potential to an amount in excess of $1 million.  The notice of a verdict potential of more than 50 times the policy limits did not prompt Gallant to initiate negotiations or to tender the policy limits.

IV.

Communication with the insured, keeping her fully aware of the claimant's willingness to settle for the amount of coverage, is a factor to be considered.  
Bailey v. Prudence Mutual Casualty Co.
, 429 F.2d 1388, 1390 (7th Cir. 1970). 

Here, Gallant and the attorneys Gallant hired never bothered telling Christine that Mrs. O'Neill was willing to settle for her policy limits, until months after the offer expired.  When defense counsel belatedly advised Christine of the settlement offer, the substance of the offer was not conveyed, and Christine was misled by being told that the company was 
still evaluating
 the demand.  The demand had expired.  There was nothing to evaluate.  Moss decided not to respond to the demand, despite everyone's advice to meet it. 

Gallant did not give its policyholder an opportunity to protect herself.  Its failure to timely communicate with its customer and its false statements when it did communicate signal bad faith.  
Bailey
, 429 F.2d at 1390.

V.

An inadequate investigation and defense is a factor to be considered.  
Ballard v. Citizens Casualty Co. of New York
, 196 F.2d 96, 102 (7th Cir. 1952).

Here, the complaint in Mrs. O'Neill's lawsuit against Christine alleged that the insured failed to use an adequate child restraint system.  If Christine had any defense to the lawsuit, it was predicated upon the reasonableness of her belief that the booster seat that her grandchild was sitting in was sufficient to restrain the child while she left him unattended in a car with the engine running.  The booster seat was a critical piece of evidence.

It should have been clear to Gallant, if it believed in such a defense, that the failure to produce the booster seat at the trial invited a strong inference that the insured either knew or should have known that the booster seat was entirely inadequate to restrain the child.  Notwithstanding, Gallant never inspected the booster seat, never photographed the seat, and never warned Christine to preserve the booster seat for use as evidence at the trial.  Gallant's neglect had two consequences:  Christine disposed of the booster seat and, because she was unable to produce the seat, the jury received the missing-evidence instruction in the underlying case.

After their assessment of clear liability and massive verdict potential and after Moss's refusal to follow their recommendation based upon that assessment, Christine's lawyers formulated a discovery plan.  They proposed taking the deposition of 13 potential witnesses.  One of the reasons was their stated desire 
to minimize the predicted excess verdict
. Apparently, Gallant did not consider that goal very important.  Only two depositions were authorized.

VI.

A substantial prospect of an adverse verdict is a factor to be considered.  
Phelan
, 114 Ill. App. 3d at 104, 448 N.E.2d at 585.

The odds of a jury rejecting Mrs. O'Neill's claim were astronomical.  Everyone knew the score.  From Gallant's most novice adjuster up the chain of command to a seasoned veteran of 25 years, everyone predicted that Christine would lose and that the verdict would top the coverage.  Defense counsel knew what was going to happen.  They predicted it.  Everyone, save Moss, got it right.  It took the jury only 40 minutes to deliberate to a verdict and award Mrs. O'Neill $731,063.

VII.

The potential for damages to exceed the policy limits is a factor to be considered.  
Mid-America Bank & Trust Co.
, 224 Ill. App. 3d at 1087, 587 N.E.2d at 84.

Gallant knew from the lawyers it hired to protect Christine's interests that the verdict potential was, at a minimum, 15 times the amount of insurance protection.  The medical bills alone were more than five times that protection.  The decision to reject the chance to settle a claim of this magnitude signals bad faith.

Gallant tries to shield its decision to forego the settlement offer with its decision to file and pursue a motion for summary judgment.  It points out that after the motion was denied, it offered the policy limits.  This facade of good faith is belied by the lawyers Gallant hired to protect Christine's interests.  Christine's lawyers, the same ones who urged Moss to protect her by tendering the policy limits, had absolutely no faith in the prospects of prevailing on the summary judgment motion.  From the moment that it was filed, they believed that it would fail, as indeed it did. 

The filing of a motion that lacked merit did not insulate Moss from the unreasonable decision to ignore everyone's opinion and allow a settlement offer to expire without a response.  If it did, insurance companies would acquire free license to play roulette with their customers' money, even in cases where circumstances compel the immediate payment of insurance proceeds in order to protect those customers.  The filing of a summary judgment motion in lieu of meeting a demand that everyone in the company deemed valid is precisely the sort of gambling with an insured's money that the doctrine of bad faith was designed to prevent.  

In the final analysis, Gallant's argument rests upon Moss's self-serving testimony that he acted in good faith when he rejected the chance to settle, because he believed that Christine was not liable.  The jury obviously found him less than credible.  It had good reason.  Moss's professed belief flew in the face of everyone who ever evaluated this case, and there were many.  Three Gallant adjusters believed that Christine was liable.  A Gallant claims director believed that Christine was liable.  Gallant's sole claims manager, who had been evaluating liability in automobile accident claims for 25 years and who denied all claims in the absence of clear negligence, believed that Christine was liable.  Everyone in the law firm that Gallant hired, a firm entrusted to handle more than 500 active claims for Gallant, believed that Christine was liable.  And the 12 people Gallant selected to determine liability at the trial believed that Christine was liable.  Without a great deal of experience in such matters, they decided that issue and fixed the amount of damages in less than an hour of deliberation. 

Despite Moss's professed belief, Gallant had promptly paid the lesser claims of people hurt because of Christine's negligence.  Despite Moss's professed belief, he tried to pay all of the coverage on the eve of the trial.  And last but not least, despite Moss's professed belief, after the verdict was returned, Gallant paid its $20,000, closed its file, and walked away.  Moss would not authorize an appeal of the liability question.  Christine was left to fend for herself and somehow mount an appeal of the $710,063 excess judgment on her own.  

The jury's finding of bad faith was not against the manifest weight of the evidence.

We turn to the question of whether punitive damages can be awarded for an insurance company's bad-faith refusal to settle.  We hold that they can.  

Gallant assails the award of punitive damages, with a multifaceted argument that those damages are contrary to the law and to the evidence. 

Issues of law are reviewed 
de novo
.  
Statler v. Catalano
, 293 Ill. App. 3d 483, 486, 691 N.E.2d 384, 386 (1997) (relying on 
Davis v. Temple
, 284 Ill. App. 3d 983, 989, 673 N.E.2d 737, 741 (1996)).

Gallant notes that no Illinois case has ever authorized common law punitive damages against an insurance carrier based upon a bad-faith refusal to settle a third party's liability claim.  There are other jurisdictions that have allowed punitive damages in certain cases where the insurance company's bad faith was particularly egregious.  
Cain v. State Farm Mutual Automobile Insurance Co.
, 47 Cal. App. 3d 783, 121 Cal. Rptr. 200 (1975); 
Campbell v. Government Employees Insurance Co.
, 306 So. 2d 525 (Fla. 1974); 
Newport v. USAA
, 2000 Okla. 59, 11 P.3d 190 (2000); 
Shamblin v. Nationwide Mutual Insurance Co.
, 396 S.E.2d 766 (W. Va. 1990).  We think that where the insurer's conduct exceeds mere negligence and, like here, demonstrates to a jury's satisfaction that the refusal to settle within policy limits was engaged in with utter indifference and reckless disregard for its policyholder's financial welfare, punitive damages can be awarded.   

Although punitive damages are not the law's favorite, Illinois has traditionally authorized the recovery of punitive damages in tort cases involving intentional misconduct or a breach of fiduciary duty.  
Cirrincione v. Johnson
, 184 Ill. 2d 109, 114, 703 N.E.2d 67, 70 (1998).  "Illinois courts are not hesitant to award punitive damages in cases where there has been a flagrant breach of fiduciary responsibility."  
Central Bank-Granite City v. Ziaee
, 188 Ill. App. 3d 936, 947, 544 N.E.2d 1121, 1128 (1989).  

Gallant cites to numerous cases where, in varying contexts, courts have held that no fiduciary relationship exists between an insurer and an insured.  See, 
e.g.
, 
Brase v. Loempker
, 267 Ill. App. 3d 415, 642 N.E.2d 202 (1994).  However, when a liability insurance company employs policy terms that obtain the irrevocable power to determine whether an offer to compromise a personal-injury claim will be accepted or rejected, it creates a fiduciary relationship between it and the insured with resulting duties that grow out of that relationship.  
Cernocky
, 69 Ill. App. 2d at 207-08, 216 N.E.2d at 204 (relying on 
Ballard
, 196 F. 2d at 102); see also 
Douglas v. Allied American Insurance Co.
, 312 Ill. App. 3d 535, 543, 727 N.E.2d 376, 382 (2000) ("An insurance company has a fiduciary duty to defend its insured and to consider the insured's interest.").

Gallant's policy terms vested it with exclusive control over Mrs. O'Neill's claim and the defense against her lawsuit.  Gallant reserved the right to hire the policyholder's lawyer.  It also retained the absolute discretion to determine whether a settlement offer should be accepted or rejected.  The policy terms rendered the policyholder helpless in the absence of Gallant's good faith.  As was demonstrated by the staggering excess judgment total under Moss's command, in the absence of good faith, Gallant's policyholders confronted significant risks of personal exposure. 

" 'Under policies like those here involved, the insurer and the insured owe to each other the duty to exercise the utmost good faith.  While the insurance company, in determining whether to accept or reject an offer of compromise, may properly give consideration to its own interests, it must, in good faith, give at least equal consideration to the interests of the insured[,] and if it fails to do so[,] it acts in bad faith.' "  
Cernocky
, 69 Ill. App. 2d at 208, 216 N.E.2d at 204-05 (quoting 
Ballard
, 196 F.2d at 102, and 
American Fidelity & Casualty Co. v. G.A. Nichols Co.
, 173 F.2d 830, 832 (10th Cir. 1949)).

Courts must offer vigilant protection to those who find themselves in a position of vulnerability in a fiduciary relationship.  See 
Central Bank-Granite City
, 188 Ill. App. 3d 936, 544 N.E.2d 1121 (elderly); 
National Bank of Monticello v. Doss
, 141 Ill. App. 3d 1065, 491 N.E.2d 106 (1986) (mentally limited).

Gallant insures mostly high-risk drivers.  Illinois requires those high-risk drivers to obtain liability coverage in order to drive.  Consequently, they pay dearly to acquire liability coverage and, almost universally, purchase only the statutory minimum.  For the most part, Gallant's customer base represents a class of driver extremely vulnerable to insurance practices performed in bad faith and contrary to an insured's interests.  This was certainly the case here.  Christine had certain known mental health problems and was hardly well-to-do.  She could not afford to hire her own attorney to protect her from her fiduciary.  Based upon Gallant's treatment, she could have used private counsel.  Such assistance might have set Gallant right when 
it wrote to inform Christine that it would defend her under a reservation of rights–when Gallant falsely claimed that it did not have to provide coverage
.  Such assistance might have set Gallant right when
 it failed to respond to the settlement demand and, thereafter, falsely claimed that it was still evaluating the demand
.  Finally, independent counsel might have suggested to Moss that his faith in a lack of liability, and his refusal to pay because of it, carried a duty to defend the liability question on appeal.  Counsel might have made Moss understand that under the circumstances of his claimed decision-making, he could not simply walk away from the adverse verdict by tendering the amount of coverage.  His oversight of Christine's interests was still in play.    

In a case like this one, we think that punitive damages for a bad-faith refusal to settle are appropriate and warranted.  After all, punitive damages are designed to deter misconduct.  Hopefully, the availability of punitive damages can provide some degree of deterrent against unscrupulous insurers who would otherwise take advantage of customers and abuse their fiduciary relationship in order to promote their own economic self-interest.  Gallant needed to be told through the award of punitive damages that it had to stop its common practice of ignoring policy-limit demands in serious cases where liability was clear-cut.  It had to be punished for a pattern of misconduct that exposed its policyholders to more than $10 million in excess judgments. 

Gallant complains about the penal nature of the compensatory damages and likens them to an award of punitive damages for the intentional infliction of emotional distress.  See 
Knierim v. Izzo
, 22 Ill. 2d 73, 174 N.E.2d 157 (1961).  The analogy is flawed.  Intentional and outrageous conduct is an essential element of intentional infliction of emotional distress, making punitive damages unavailable as an element of recovery.  Here, the actual damages awarded were not punitive in nature.  They represented the damages actually sustained as a result of Gallant's misconduct.  The misconduct being punished was not a necessary element in proof of the committed tort.  

Gallant raises section 155 of the Illinois Insurance Code (215 ILCS 5/155 (West 1998)) and argues that it preempts common  law liability for punitive damages for a wrongful refusal to settle.  See 
Cramer v. Insurance Exchange Agency
, 174 Ill. 2d 513, 675 N.E.2d 897 (1996).  While the Illinois Supreme Court has held that section 155 preempts punitive damages in first-party-insurance-benefit-denial cases, it has also carefully differentiated first-party claims from cases where insurers wrongfully refuse to settle third-party claims.  For first-party insurance claims, the General Assembly created a statutory penalty to supplement the policyholder's breach-of-contract remedy.  However, a policyholder with excess liability as a result of his insurer's wrongful refusal to settle with a third party has no contractual or statutory remedy.  We believe that the supreme court had in mind cases like this one when it noted that section 155 does not preempt a claim of insurer misconduct based upon a separate and independent tort.  
Cramer
, 174 Ill. 2d at 530, 675 N.E.2d at 905-06.

Gallant challenges the evidence of wrongdoing and contends that it did not establish the kind of misconduct that calls for a punitive-damages award.  A jury enjoys wide latitude in deciding whether a defendant’s misconduct is sufficiently egregious to warrant the imposition of punitive damages.  
Cirrincione
, 184 Ill. 2d at 116, 703 N.E.2d at 71.  We will not disturb a finding of liability for punitive damages unless it is against the manifest weight of the evidence.  
Cirrincione
, 184 Ill. 2d at 115, 703 N.E.2d at 70.

We need not belabor the evidence of bad faith that supports punitive damages.  Suffice it to say, there was ample evidence from which a jury could reasonably infer that Gallant 
deliberately
 chose to gamble with Christine's financial security, in the hope of 
merely delaying the payment of minimal policy limits
.  It would have been quite reasonable for jurors to conclude that Gallant threw Christine's financial future to the wind for the small amount of revenue it could derive from its $20,000 before a judgment could be rendered.  Of course, jurors could have also reasonably inferred from the evidence that the nontender of money until the eve of the trial was a calculated design, widespread in its application and utilized on numerous claims where it was obvious that the coverage would ultimately have to be paid.  By exposing a lot of its customers to excess judgments in order to delay the payment of valid third-party claims, Gallant could amass considerable revenue.  Hence, jurors possessed evidence from which they could reasonably conclude that corporate greed motivated Gallant's breach of fiduciary duty and that its greed was pervasive–that Gallant routinely betrayed its customers' interests by deliberate design.   

At a minimum, based upon the evidence presented, the jury was entitled to believe that Gallant's conduct showed an utter indifference and a reckless disregard for its policyholder's financial welfare and that Gallant breached a fiduciary duty to factor that welfare into its decision-making.  Such a finding surpasses the threshold for the imposition of punitive damages.  
Home Savings & Loan Ass'n of Joliet v. Schneider
, 108 Ill. 2d 277, 284, 483 N.E.2d 1225, 1228 (1985).

Gallant's argument relies heavily upon Moss's self-serving claim of good faith, a claim that the jury obviously refused to believe.  Indeed, it seems fairly possible that the jury's view of that testimony added to their understanding of why punitive damages were appropriate and warranted.  We reiterate some of the sound reasons why the jury chose not to credit Moss's testimony.  Obviously, for Moss to harbor a genuine belief that Christine was not liable, he had to conclude that a number of valued employees' views were wrong and further conclude that the lawyers hired to defend the case tendered an evaluation unworthy of belief.  

During his testimony at the bad-faith trial, Moss claimed that he believed that Christine would prevail as a matter of law and that is why he rejected the demand to settle for the policy limits.  However, the claims diary did not contain a contemporaneous entry of this evaluation, to support his decision when it was made.  The absence of a contemporaneous notation of Moss's position was at odds with Gallant's policy to require a written record of all evaluations in the claims diary.  It was also at odds with Department of Insurance regulations. 

The only notation of Moss's thought process that was contemporaneous with the decision to ignore the policy-limits demand contradicted his ultimate claim of good faith based upon a belief in the absence of liability. 

Just two days after Moss rejected Donna Hedl's settlement recommendation, defense counsel memorialized a conversation with Moss.  Moss was not interested in having defense counsel file for summary judgment.  He was not interested in testing liability.  He did not even mention or discuss a contrarian view that the claim lacked merit.  Moss was solely interested in settlement.  However, he wanted Mrs. O'Neill's underinsured-motorist coverage to pay for Christine's negligence, rather than Gallant.  

The memorandum recorded that Moss wanted counsel to research whether a change in the law would allow Mrs. O'Neill to pursue underinsured-motorist coverage even though she did not recover the full policy limits from the underinsured negligent driver.  Moss wanted to foist compensation for Mrs. O'Neill's injuries onto her own carrier.  His strategy harbored the obvious belief that Mrs. O'Neill's carrier would be willing to recognize the existence of liability.  Moss was interested in the research because, if the law had changed to allow for it, the availability of underinsurance, in Moss's words, "might enable us to bargain for a lesser amount with plaintiff's counsel than full policy in this matter."  When Moss suggested this settlement strategy, he fully understood that no underinsured-motorist carrier was going to pay money in the absence of liability on the part of Christine.  

Thus, the documentation of Moss's contemporaneous thought process demonstrated a desire to engage in conduct inconsistent with a genuine belief that Christine would prevail as a matter of law.  However, the desired conduct was entirely consistent with the reason punitive damages were being sought.  Gallant was pursuing a possible settlement of the claim in a way that kept its interests paramount, and it gambled its insured's interest in a policy-limits settlement on a preposterous strategy designed to shift its responsibilities onto another insurance company.   

Moss also claimed that he never altered his belief that the insured had an absolute defense to liability.  Thus, according to Moss, the trial court committed error in the underlying case by submitting the claim to the jury and refusing to set aside an erroneous verdict.  However, Moss refused to authorize an appeal.  Again, his actions were inconsistent with a genuine belief that Christine would prevail as a matter of law.    

We find that an award of punitive damages is supported by the evidence.  The jury's award is not manifestly erroneous. 

Finally, Gallant argues that the punitive-damages award is grossly excessive, unreasonable, unwarranted by the evidence, and a violation of due process.

We review the determination on a challenge to the size of a punitive-damages award 
de novo
.  
Cooper Industries, Inc. v. Leatherman Tool Group, Inc.
, 532 U.S. 424, 436, 149 L. Ed. 2d 674, 687, 121 S. Ct. 1678, 1685-86 (2001).  The constitutionality of such an award depends upon its size.  Fundamental fairness embodied in due process prohibits "grossly excessive" punitive damages.  
BMW of North America, Inc. v. Gore
, 517 U.S. 559, 574, 134 L. Ed. 2d 809, 825, 116 S. Ct. 1589, 1598 (1996).  The United States Supreme Court has established three criteria to consider when determining whether an award of punitive damages is "grossly excessive":  "the degree of reprehensibility of the [conduct]; the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases."  
BMW of North America, Inc.
, 517 U.S. at 575, 134 L. Ed. 2d at 825-26, 116 S. Ct. at 1598-99.

We must side with Mrs. O'Neill and against Gallant on the extent to which the evidence established the existence of reprehensible conduct on the part of Christine's insurance provider.  If the term "reprehensible" means shameful, 
i.e.
, conduct deserving of severe reproach, Gallant's treatment of Christine, and others who bought insurance from it, was truly reprehensible.  

We can start with Gallant's treatment of Christine, who suffered from a mental illness and who totally lacked financial resources.  Christine was completely dependent upon Gallant for help in handling her exposure to financial ruin.  It hired the lawyers to champion her defense.  It employed a team of professional adjusters and an experienced claims manager.  It had the money to pay for a complete release from liability.  It possessed the means to protect Christine's financial future.  

Gallant also possessed the experience to know that if Christine was found liable, the injuries that she caused meant certain bankruptcy for her, given her meager policy limits.  It also possessed the experience to understand that, in terms of Christine's predicament, a policy-limits demand was "God-sent."  

Despite its duty to exercise "utmost good faith" and its fiduciary role over a vulnerable customer's financial future, Gallant initiated its handling of Christine's claim with a spurious attempt to flatly disclaim coverage.  Christine's fiduciary set the tone of their relationship in a letter in which it advised Christine that her delay in forwarding paperwork relieved it of its obligation to provide coverage.  Although the purpose of this false claim is unclear, it had to inflict fear and mental anguish over a lack of protection. 

Gallant refused to use the tools at its disposal to protect Christine's financial future.  It consciously failed to respond to, much less meet, a policy-limits settlement demand.  Its decision to forego settlement was made in the face of urging from various Warrior adjusters, supervisors, and directors, in addition to its highly experienced claims manager, to settle the claim for the policy limits.  The claims manager for Warrior, and hence for Gallant, admitted in writing that if Gallant did not settle for the policy limits, it would not be fulfilling its fiduciary role by giving Christine's interests equal weight in the settlement process.  Christine's lawyers urged Gallant to settle for the policy limits.  They warned of clear liability and the likely prospect of a massive excess judgment.  They also wanted to take 13 depositions in a stated effort to minimize the excess judgment that they predicted Christine would face in the absence of a settlement.  Christine's attorney fees were fixed, and the depositions did not mean additional attorney fees for Gallant.  Nonetheless, Gallant would not authorize the effort to minimize Christine's risk.  The only reason Gallant would not authorize the recommended action on Christine's behalf had to be the cost of a court reporter. 

When the predicted excess judgment arrived, Gallant threw its policy limits at the problem that its misconduct caused, and it refused to authorize an appeal despite its purported devout belief in a lack of legal liability. 

In assessing the degree of reprehensibility, we think it fair to conclude that Gallant blatantly ignored its policyholder's financial security and did virtually nothing to protect her, despite a golden opportunity to do so.  Its decision to bypass a settlement of Mrs. O'Neill's claim for the payment of $20,000 is inexplicable.  Its conduct toward Christine was shameful.  Its explanation for the misconduct only compounded it.  

However, the conduct that the jury punished was conduct that extended beyond the handling of Christine's case.  The jury learned that Gallant's treatment of Christine was but the tip of the iceberg.  Below the surface lay a host of excess judgments occurring under similar circumstances.  Moss routinely withheld Gallant's money in cases where legitimate claims could have been settled for customers' policy limits.  Gallant's misconduct went far beyond the mismanagement of its fiduciary duty in one isolated case where it should have settled a claim.   

Gallant's view of its fiduciary responsibility to Christine was a view that it shared with its other customers.  Gallant policyholders suffered more than $10 million in excess judgments, the result of numerous lawsuits where policy-limit demands were cavalierly ignored.  There is a pattern to Gallant's misconduct that pervades its handling of third-party claims. 

In presenting other examples of Gallant's claims practices, Mrs. O'Neill focused on one verdict in particular, to show the jury just how shameful Gallant's treatment of an insured could be.  The verdict in Crumer v. Riddle
(footnote: 3) was rendered over a year after the verdict that underlies this case and painfully demonstrates how Gallant followed a blueprint for bad faith in the process by which it exercised its power over settlements.  

Mrs. Crumer was also an elderly woman.  She was also a pedestrian struck by a driver insured by Gallant.  Gallant's driver admitted that he was going too fast.  Witnesses testified that his car was "actually airborne" when it came over the hill that obscured Mrs. Crumer, who was crossing the road far below the hill's crest.  Because of the excessive speed, Gallant's insured driver was unable to bring his car to a stop, and he struck Mrs. Crumer.  

Liability was clear.  All that Gallant had to determine was whether the damages were severe enough to warrant the payment of its $20,000 worth of coverage.  

Mrs. Crumer had both legs amputated as a result of the accident and incurred $360,476.52 in medical bills prior to the trial.  Riddle, Gallant's insured, had $20,000 worth of coverage with Gallant and $50,000 worth of coverage with another carrier.  Mrs. Crumer's attorney offered to settle for Gallant's policy limits eight months prior to the trial.  The other carrier agreed to pay its $50,000 policy limits.  Gallant failed to respond prior to the expiration of the offer, which remained open for 35 days.  Riddle suffered an excess verdict of approximately $1.9 million.

Gallant conducted its business in a manner that was totally insensitive to the risks facing its policyholders.  Its misconduct was clearly reprehensible enough to commend serious punishment.  The $2.3 million in punitive damages provided a fitting measure of punishment for Gallant's routine transformation of policy-limits settlement demands into massive excess judgments for its policyholders.

The second consideration in the determination of an award's excessiveness is the disparity between the harm actually suffered and the sum of punitive damages.  Here, that disparity is not excessive.  Gallant's misconduct caused Christine to suffer a $710,063 excess judgment.  The punitive damages were only slightly higher than triple the actual damages.  This proportion of actual damages to punitive damages is not out of line with cases that have found punitive-damages awards constitutional.  See 
Ford v. Herman
, 316 Ill. App. 3d 726, 733-35, 737 N.E.2d 332, 339-40 (2000) (punitive damages 75 times higher than compensatory damages); 
Pickering v. Owens-Corning Fiberglas Corp.
, 265 Ill. App. 3d 806, 827, 638 N.E.2d 1127, 1141 (1994) (punitive damages 25 times higher than compensatory damages); 
Ciampi v. Ogden Chrysler Plymouth, Inc.
, 262 Ill. App. 3d 94, 112-13, 634 N.E.2d 448, 462 (1994) (punitive damages 20 times higher than compensatory damages). 

Finally, the jury's award is in line with punishment meted out in comparable cases.  Gallant had fair warning that an abuse of fiduciary duty had potentially grave consequences.  See, 
e.g.
, 
National Bank of Monticello
, 141 Ill. App. 3d 1065, 491 N.E.2d 106 (compensatory damages of $500,000 and $2 million in punitive damages).

The punitive-damages award did not approach the percentage of net worth awarded in other cases where misconduct amounted to a breach of fiduciary duty.  According to Gallant's annual report to the Illinois Department of Insurance, Gallant had a net worth exceeding $25 million as of December 31, 1998.  Moss actually testified, under oath, that Gallant's financial report to the Department of Insurance substantially overstated its net worth.  Indeed, Gallant tenders argument on appeal based upon the "real" net worth of Gallant rather than the one reported to Illinois's insurance regulators and considered by the jury in its assessment of damage.  We think that the jury was entitled to base its assessment of damage upon the net worth that Gallant wanted to show the Department of Insurance.  Based upon that net worth, the punitive-damages award was less than 10% of the company's value.  Given the ratio of punitive damages to net worth in comparable breach-of-fiduciary-duty cases, the measure of punishment could have been far worse.  See 
National Bank of Monticello
, 141 Ill. App. 3d at 1074, 491 N.E.2d at 111-12.

We find that the punitive-damages award was not grossly excessive.  The jury's award of $2.3 million to punish Gallant for its misconduct did not deprive Gallant of due process under the fourteenth amendment.  

Finally, during supplementary proceedings, a judge had to compel Christine to assign her claim against Gallant to Mrs. O'Neill.  Gallant argues that the order compelling Christine to assign her claims was invalid.  Its argument finds support in the precedent of this court.  
Roundtree v. Barringer
, 92 Ill. App. 3d 903, 906, 416 N.E.2d 675, 677 (1981).

More than two decades ago, we prohibited, as a matter of public policy, involuntary assignments of bad-faith-settlement actions.  
Roundtree
, 92 Ill. App. 3d at 906, 416 N.E.2d at 677.  We carved this exception out of clear statutory language to the contrary.  Other panels of our court were quick to examine the public policy concerns expressed by Justice Kasserman.  A host of justices flatly rejected the notion that public policy should trump the clear statutory authority provided under section 2-1402(c)(5) of the Code of Civil Procedure (735 ILCS 5/2-1402(c)(5) (West 1998)).  
Phelan
, 114 Ill. App. 3d at 102, 448 N.E.2d at 583; 
Nicholson v. St. Anne Lanes, Inc.
, 158 Ill. App. 3d 838, 840-42, 512 N.E.2d 127, 128-29 (1987).

The validation of compulsory assignments of bad-faith-settlement claims set forth in 
Phelan v. State Farm Mutual Automobile Insurance Co.
 has had almost two decades to test the fears that motivated our limitation of that class of involuntary assignments.  Justices Kasserman, Karns, and Jones worried about "fishing expeditions by judgment creditors" that "could lead to champerty and an overburdening of the courts with specious lawsuits."  
Roundtree
, 92 Ill. App. 3d at 906, 416 N.E.2d at 677.  This past trepidation has proven ungrounded over the passage of time.  Today, we have no reason to harbor such concerns.  Accordingly, we side with the statutory language that authorizes the compulsory assignment of choses in actions, and we hold that courts may exercise their statutory power to enforce judgments by involuntary assignments in all cases, including bad-faith-settlement claims.   

[Nonpublishable material under Supreme Court Rule 23 (166 Ill. 2d R. 23) omitted here.]

For the reasons stated, we affirm.

Affirmed.

RARICK and WELCH, JJ., concur.

                                      NO. 5-00-0505

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

___________________________________________________________________________________________________________

MARGUERITE A. O'NEILL, )  Appeal from the

)  Circuit Court of

     Plaintiff-Appellee, )  Madison County.

)

)  No. 98-L-697

)

GALLANT INSURANCE COMPANY, )  Honorable

)  George J. Moran,

     Defendant-Appellant. )  Judge, presiding.

___________________________________________________________________________________________________________

Opinion Filed
: April 23, 2002

___________________________________________________________________________________________________________

Justices
: Honorable Clyde L. Kuehn, J.

Honorable Philip J. Rarick, J., and

Honorable Thomas M. Welch, J.,

Concur

___________________________________________________________________________________________________________

Attorneys
 Edward J. Kionka, 220 Lesar Law Building, P.O. Box 10, Carbondale, IL 62903; Alvin R. Becker, 

for
 Beerrmann, Swerdlove, Woloshin, Barezky, Becker, Genin & London, 161 North Clark Street, Suite

Appellant
 2600, Chicago, IL 60601-3297

____________________________________________________________________________________________________________

Attorney
 David L. Antognoli, Hopkins, Goldenberg, P.C., 2227 South State Route 157, P.O. Box 959, Edwardsville,

for
 IL 62025

Appellee
 

___________________________________________________________________________________________________________

FOOTNOTES
1:
The defendant in this suit, Gallant Insurance Company, is a part of the Warrior Insurance Group.  In the companies' hierarchies, John Moss oversees certain Gallant Insurance Company departments.  Further details about the relationship of the two companies are included later in the body of this opinion.

2:
The amount of damages awarded by the jury in the original negligence case against Gallant's insured was $711,063.  That verdict was the foundation for this subsequent bad-faith case against Gallant.  In this case, the jury returned a verdict for actual damages in the amount of $710,063.  The record does not reflect, and counsel for the parties do not offer, any explanation for the $1,000 discrepancy.

3:
Crumer v. Riddle, No. 01-L-173, was also filed in Madison County.

COMMENTS AND ANNOTATIONS
Text Box 1:

TEXT BOXES
NOTICE

Decision filed 04/23/02.  The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.