**WEST SIDE SALVAGE, INC., Plaintiff,**

v.

**RSUI INDEMNITY CO., Defendant.**

**Case No. 15-cv-0442-MJR**

United States District Court, S.D. Illinois.

Signed October 17, 2016

Brad J. Brady, Matthew L. Preston, Brady Preston Brown PC, Cedar Rapids, IA, for Plaintiff.

Christopher A. Wadley, Robert P. Conlon, Ryan J. Rodman, Walker, Wilcox et al., Chicago, IL, for Defendant.

## MEMORANDUM AND ORDER

REAGAN, Chief District Judge:

### A. Introduction and Procedural Overview

The present litigation stems from the outcome of a jury trial before this Court in the spring of 2012. The underlying litigation concerned a grain elevator explosion on April 27, 2010, at a facility belonging to Con Agra. In the underlying suit—by indi-

vidual plaintiffs (John Jentz and Robert Schmidt) and a corporation (Con Agra)— the jury returned verdicts in favor of the plaintiffs to the tune of $21 million dollars for the individual plaintiffs' and $3 million dollars for Con Agra.[1] West Side carried traditional insurance from Colony ($1 million policy limit), and excess insurance from RSUI ($11 million policy limit). The verdicts rendered exceeded the combined policy limits of the coverage ($12 million). The present dispute, brought by West Side against the excess insurer, RSUI, contains a claim by West Side that RSUI's actions were injurious because RSUI failed to settle the underlying dispute—something West Side contends would have resulted in significantly less fiscal liability. RSUI argues in its counter-claim that it had no duty to settle the claims because the property damage claims by Con Agra fell outside the scope of its insurance coverage, and thus it had no duty to settle those claims. In accord with its argument, RSUI seeks a declaratory judgment disclaiming its liability to West Side in light of its proffered interpretation of the insurance contract.

The Court is faced with numerous motions at this juncture, including: motions in limine (Docs. 37, 38, 39, 49, 53, 54, 57), motions regarding the appropriate choice of law (35, 55, 58), and motions for summary judgment (36, 56, 59). The Court will first address the choice of law dispute, and it will then turn its attention to the summary judgment motion.

## B. Factual Background

In April of 2010, Con Agra contacted West Side to inquire about services they offered to address a 'hot bin' situation at Con Agra's grain elevator. The parties reached some sort of agreement regarding the services West Side could provide, and work commenced shortly thereafter. West Side employed a subcontractor, A & J, to assist in the grain elevator operation. Though there were many individuals who physically worked on the Con Agra job site who were involved in the underlying trial, the important names for this case are Becker (West Side's employee), and Jentz and Schmidt, A & J's employees. On April 20, 2010, during West Side's work on the grain elevator an explosion occurred injuring these three men. Ultimately Jentz and Schmidt employed joint counsel to pursue a claim against West Side and Con Agra, while Becker utilized separate counsel. The cases were joined for trial.

Leading up to the trial, numerous parties became ensnared in the litigation. A brief list of parties is helpful:[2]

---

1. In addition to Jentz, Schmidt, and Con Agra, there was also pending litigation by West Side's employee Becker (who was injured in the explosion), and by another party—Lohman. From time to time these parties will be referenced in this memorandum, though what came of these parties is of no direct concern in resolving the motion before the Court. The important thing to remember about Becker is that, because he was an employee of West Side his claims were more in the nature of workers compensation, as opposed to a straightforward tort suit. It also bears mentioning that the verdicts returned by the jury in the underlying case were far greater than these two sums, but a number of the verdicts were upended on appeal.

2. This is not an exhaustive listing of all attorneys or parties involved. A review of the evidence submitted indicates that in addition to those named above, numerous other attorneys participated in the underlying litigation. For example, Leo Knowles stated in his deposition that when faced with an area of law he was not particularly familiar with in this case, he would rely upon other counsel of Con Agra to address the pertinent issues. Of course this sort of reliance is to be expected in the legal profession, the Court simply notes the involvement of additional parties to emphasize how many individuals there were driving forward competing interests in the underlying litigation.

- West Side participants included:
  - John Voigt, an executive officer of West Side;
  - Kevin Visser and other members of his firm, as personal counsel to West Side;
  - Colony Insurance Company, West Side's primary insurer, represented by Kent Lawson
  - RSUI, West Side's excess insurer was represented by—
  - Natalie Limber (attended trial and negotiated on behalf of RSUI);
  - Lee Shuman (oversaw Limber from RSUI and received correspondence regarding settlement proposals);
  - William Kautter (worked on late settlement negotiations);
  - Mike Knippen (worked on settlement negotiations);
  - John Schultz and members of his firm, as RSUI's main trial counsel;
- Con Agra was represented by:
  - Siobhan Murphy (Murphy's firm appeared to have settlement authority on behalf of Con Agra, though it is not actually clear from the record what role Murphy served);
  - Leo Knowles, as Con Agra's general counsel;
  - ACE, Con Agra's insurer above its own $3 million contribution, was represented by:
  - Kimberly Moody (negotiated on behalf of ACE);
  - Joseph Ortlet and John Patton, as Con Agra's primary trial counsel;
- Plaintiffs Jentz and Schmidt were represented by Robert Clifford and members of his firm; and,
- Plaintiff Becker was represented by Marc Taxman.

Many of these individuals were deposed, or supplied declarations to the parties in the present litigation. Excerpts of those depositions were appended to the parties' summary judgment briefs.

Throughout the course of the underlying litigation, the parties at various times attempted, but failed to settle all of the claims pending. An initial mediation was held by Judge J. Phil Gilbert on January 17, 2012. Though the mediation was set to last for two days, talks were so unsuccessful that the mediation was terminated after a single day. Con Agra's trial counsel, Ortlet, sent a letter to Moody after the mediation urging ACE to attempt to resolve the matter by fronting its total policy limit of $25 million in addition to Con Agra's $3 million to attempt to reach a settlement. (Doc. 56-5 at 41-44). Despite this urging, the record does not contain concrete evidence of Con Agra or ACE approaching RSUI or West Side to settle in the months between the initial mediation and trial.

Following the January settlement conference, West Side's own trial counsel opined that West Side had relatively limited exposure. He valued the claims against West Side at approximately $5 million or less. RSUI's counsel, Lee Shuman, also wrote an email memorializing his perception of the settlement discussions. (Doc. 56-2 at 71-73). Shuman noted that Magistrate Frazier encouraged RSUI to front the full $12 million dollars to settle the case, though RSUI explained its hesitancy to offer anything without Con Agra expressing a willingness to participate in settlement, which Magistrate Frazier was apparently sympathetic to. (Doc. 56-2 at 71-72). From the time of the settlement until April 2012, the record is relatively silent as to the existence of any potential settlement progress.

Discussions began moving again on April 9, 2012. On that date the undersigned Judge (who presided over the underlying trial) denied Con Agra's motion for summary judgment as to certain issues, and reserved ruling on West Side's motion for summary judgment. The rulings prompted West Side's trial counsel, Schultz, to reassess his evaluation of liability in the case. Schultz sent a letter to Limber indicating that, in light of the developments, he was concerned that West Side's liability could well exceed $5 million dollars. (Doc. 56-2 at 74-76). On April 10, 2012, West Side's personal counsel, Visser, sent a letter to Shuman at RSUI urging RSUI to tender policy limits of $12 million to attempt settlement of the claims, which were now valued at far greater than $5 million. (Doc. 56-3 at 46-47).

Clifford, trial counsel for Jentz and Schmidt, stated in his deposition that he would have been willing to settle with West Side and RSUI for policy limits up until motions in limine were completed and the jury was seated. Despite this statement, there is no evidence in the record that Clifford made a firm memorialized demand, or that RSUI made any firm memorialized offers. Clifford also stated that once trial began, no specific offers were exchanged between RSUI and his clients. He stated that he would not have accepted a $12 million dollar offer from RSUI at that point. He also stated that as the trial got rolling he got "blinders on" and focused on trying the case because he had the sense that settlement was hung-up by behind the scenes negotiations between ACE, Con Agra, RSUI, and West Side.

A few days into the trial, witnesses began to perform much more poorly than anticipated by some accounts. This apparently gave rise to a scramble by all involved attorneys to begin discussing settlement options again. On May 15, 2012, Moody submitted a settlement offer concerning the Jentz claims to Limber. Moody subsequently revised the offer to include Schmidt. Emails and letters show that Limber was actively negotiating the deal by consulting other members of RSUI and by also putting together a counter-proposal for ACE/Con Agra. Those efforts culminated in at least one counter-proposal being submitted to Moody.

On May 22, 2012, Siobhan Murphy sent a letter with two settlement options to Limber. Limber again reviewed the proposal and consulted others about it. Limber determined that the proposal was potentially flawed because it still offered no guarantee that if RSUI fronted the full $12 million then it would be released from all claims. Limber replied to Murphy on May 24, 2012 with a counter-proposal shoring up the gaps she saw for West Side. Murphy immediately rejected the proposal and indicated that Con Agra would no longer engage in attempts to negotiate with RSUI regarding any of the matters (Jentz/Schmidt/Becker/Con Agra's own claims).

In the midst of the back and forth between Limber, Moody, and Murphy, many of the attorneys involved in this litigation were consulting and speculating as to possible formulas to resolve the matter. It is clear from the record that every attorney who worked on this case thought at one time or another that there should have been a way to settle the case. Emails and letters during the trial show the insistence of various parties on finding a way to settle, and the deposition testimony and declarations of lawyers reflect almost a sense of remorse that settlement never was achieved in the underlying litigation. During the underlying litigation, there were several explicit mentions in the parties' various communications of the possibility that a bad faith failure to settle claim

could emerge from the underlying litigation. Limber herself acknowledged this possibility at one point, and suggested that RSUI should tender its limits simply to attempt to dodge such a claim. Though the case law about an insurers' duty to settle gives deference to trial attorneys for lacking the prophecy to accurately forecast the outcome of trial, unfortunately, Limber's sense of prophecy regarding a bad faith claim was spot on. The present case is now before this Court for a ruling on RSUI's motion for summary judgment filed in opposition to West Side's suit for a bad faith failure to settle the underlying litigation.

## C. Legal Analysis

■■■ A choice of law dispute is governed by the law of the forum state, in this case, Illinois. The parties' contest whether the choice of law principles for tort or contract law apply. Accepting either interpretation, the guiding principles for a choice of law determination are very similar. The test for tort claims is found in section 145 of the *Restatement (Second) of Conflict of Laws* and "involves balancing a number of factors, including the place where the injury occurred; the place where the conduct causing the injury occurred; the domicile or place of business of each party; and the place where the relationship between the parties is centered." *Ennenga v. Starns*, 677 F.3d 766, 774 (7th Cir. 2012) (citation omitted); *Mendez v. Atlantic Painting Co., Inc.*, 404 Ill.App.3d 648, 344 Ill.Dec. 378, 936 N.E.2d 1135, 1140 (2010); Restatement (Second) Conflict of Laws § 145(1) (1971). Applying these factors, the Court is to evaluate the relative importance of the facts with respect to the particular issue. After determining the most significant relationship pursuant to the factors, a court must then consider the policy factors of section 6 of the *Restatement (Second) of Conflict of Laws*, including: the relevant policies of the forum; the relevant policies of other interested states, the protection of justified expectations, and the predictability and uniformity of the result.

■■■ Under a contract centric analysis, the Court considers the factors in section 188 of the *Restatement (Second) of Conflict of Laws*. Those factors include: the place of contracting; the place of negotiation of the contract; the place of performance; the location of the subject matter of the contract; and, the domicile, residence, nationality, place of incorporation and place of business of the parties. Restatement (Second) of Conflicts, § 188 (1971). After considering the factors, the Court is also to turn to the section 6 factors listed above.

The parties dispute whether the Court should apply the tort or contract centric analysis to the issue in the present case. The Defendants argue that the Court should apply a contract analysis because, though the ultimate harm, economic injury, is technically a tort, at base the harm is intertwined with contractual obligations. In support of this argument, Defendants cite *Home Ins. Co. v. Service Am. Corp.*, 654 F.Supp. 157, 158–59 (N.D. Ill. 1987) and *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 217, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985)—two cases discussing tort claims inextricably intertwined with the interpretation of contractual duties and provisions. In both cases, the courts opted to apply contract choice of law principles. *See Home Ins. Co.*, 654 F.Supp. at 158–59 ("this court elects to apply Illinois choice of law principles applicable to insurance contracts to determine whether a tort claim for bad faith seeking punitive damages can be asserted"); *Allis–Chalmers Corp.*, 471 U.S. at 218–19, 105 S.Ct. 1904 ("Because the right asserted not only derives from the contract, but is defined by the contractual obligation of good faith,

any attempt to assess liability here inevitably will involve contract interpretation...questions of contract interpretation, therefore, underlie any finding of tort liability, regardless of the fact that the state court may choose to define the tort as 'independent' of any contract question.").

By contrast, the Plaintiffs identified a number of cases, including a recent decision from this Court, wherein tort choice of law principles were applied to similar situations involving insurers and potential torts. *See ACE Am. Ins. Co. v. Sandberg, Phx. & Von Gontard, PC,* 900 F.Supp.2d 887, 895 (S.D. Ill. 2012) (applying the tort choice of law principles to a conflict between an excess insurer and a law firm who represented the insured, and noting that the standards for tort or contract choice of law are essentially the same); *York v. Globe Life & Acc. Ins. Co.,* 734 F.Supp. 340, 341 (C.D. Ill. 1990) (finding that a contract choice of law analysis was not helpful where one of the claims was a "tort claim alleging a breach of duty of good faith" arising from a contract).

■ Given the relative similarity of the contract and tort analysis, this Court is going to follow suit with its earlier decision in the *Ace Am. Ins. Co.* case by applying the tort choice of law principles to the bad faith failure to settle portion of this dispute. 900 F.Supp.2d at 895. The controversy in the present suit is discrete and is focused on the harm sustained due to an alleged bad faith failure to settle by the Defendants. Such harm is a tort.

■ An analysis of the tort choice of law principles is as follows. Economic loss occurs at the place where the economic consequence is felt. However, there is no suggestion by the parties that West Side has

paid the money it seeks in this suit ($3 million for Con Agra's property damage claim),[3] so this factor is neutral. As to the place where the conduct giving rise to the injury occurred—the place is clearly Illinois because the litigation of the underlying case, and the numerous opportunities to settle leading up to trial and during trial took place in Illinois, before this Court. The parties are located in different places—RSUI in New Jersey, and West Side in Iowa, so this factor does not strongly support either jurisdiction over Illinois. As to the relationship between the parties, though it may have been formed in Iowa, the relevant relationship to this suit is the interactions between the parties during the trial in Illinois. Accordingly, for purposes of this controversy, the relationship factor weighs in favor of Illinois.

Turning to the *Restatement* section 6 factors, these factors also favor applying Illinois law. First, the policies of the forum regarding a duty to settle favor applying Illinois law because the Court has an interest in ensuring that parties appearing before it exercise good faith in attempting to resolve cases. Though Iowa, or other possible jurisdictions, also have an interest in the efficient resolution of cases, their interest is slightly less strong where the litigants are contesting an underlying injury that occurred out of state, and the forum being used for the litigation is also out of state. Next, the protection of expectations weighs in favor of Illinois law because expectations are most easily and most logically set by the forum within which parties are litigating. It makes sense for a court sitting in Illinois to apply Illinois law in order to set norms and expectations for other litigants coming before said court. Finally, as to finality and predictability—

---

**3.** There is a declaration that the Jentz and Schmidt claims were settled after trial and after appeal to the Seventh Circuit by ex-hausting the policy limits of RSUI's coverage and that those claims have been satisfied in full. (Doc. 36-3 at 46).

this factor, like expectations, weighs in favor of Illinois because an Illinois court applying Illinois law is most likely to reach predictable and sound results via an application of its own body of law with which it is most familiar. Accordingly, the section 6 factors weigh in favor of applying Illinois law to the tort portion of the present dispute before the Court.

However, the Court will diverge slightly from a pure tort analysis by applying contract choice of law principles to the portions of the underlying claims that call for interpretation of the various contractual provisions of the insurance coverage. As the Defendants argue, the contract choice of law principles favor an application of Iowa law. The Court finds that it is appropriate to split its application of the law in this way because the contract was clearly entered in Iowa, it was presumably negotiated in Iowa, and one of the parties to the contract (West Side) is found in Iowa. The other section 188 factors are relatively neutral with regards to which jurisdiction's law should apply.

The standard for summary judgment is well-established: the movant must first make an initial showing that there are no genuine questions of material fact and that he is entitled to judgment as a matter of law, and then the burden shifts to the other side to respond. *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015). The movant can discharge his initial burden in two ways: he can show that there is an absence of evidence supporting an essential element of the non-moving party's claim if the non-moving party has the burden of proof on that claim at trial, or he can present affirmative evidence that negates an essential element of the non-moving party's claim. *Hummel v. St. Joseph County Board of Commissioners*, 817 F.3d 1010, 1015–16 (7th Cir. 2016). After that, the non-moving party must

"come forward with specific facts showing that there is a genuine issue for trial." *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 951 (7th Cir. 2013); *see also Spierer*, 798 F.3d at 507. In that sense, summary judgment is the "put up or shut up" moment in a lawsuit, when a party must "show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2007).

The Defendant's Motion for Summary judgment and the Plaintiff's response requires the Court to engage in a thorough interpretation of the parties' Commercial General Liability ("CGL") insurance contract. Accordingly, as discussed above, the Court finds it appropriate to apply Iowa law in this case to the extent the case requires interpretation of the insurance contract.

The Iowa Supreme Court provided an excellent framework for analyzing CGL contract disputes in *Pursell Const., Inc. v. Hawkeye–Security Ins. Co.*, 596 N.W.2d 67, 69 (Iowa 1999). "First, we look to the insuring agreement. If there is coverage, we look next to the exclusions. Last, if any exclusions apply, we then consider whether [there is] is an exception to the exclusion." *Id.* Here, the first disputed point is whether or not the explosion at the Con Agra grain elevator falls within the basic coverage of the CGL policy between West Side and RSUI. RSUI argues that the explosion does not fall within the general coverage because it did not constitute an "occurrence" or "accident" as contemplated by the CGL policy.

The policy defines coverage to include bodily injury and property damage if "caused by an 'occurrence.'" (Doc. 1 at 27). An occurrence is defined as "an accident, including continuous or repeated exposure

to substantially the same general harmful conditions." (Doc. 1 at 40). Such use of the term 'occurrence' is common place in CGL policies, and thus Iowa courts have, on a number of occasions, had the opportunity to further define an 'occurrence' in the real world context for purposes of CGL insurance. In support of their argument that the explosion was not an occurrence, the Defendants cite *Yegge v. Integrity Mut. Ins. Co.*, 534 N.W.2d 100, 102–03 (Iowa 1995), wherein the court found that an insured construction contractor's CGL coverage did not cover expenses related to fixes made to bring a home up to the purchasers' satisfaction because the faulty workmanship was not an 'occurrence.'

However, the more persuasive case is the Iowa Supreme Court's recent decision in *Nat'l Sur. Corp. v. Westlake Inv. LLC*, 880 N.W.2d 724 (Iowa 2016) (hereinafter *"Westlake"*). As the Plaintiffs argue, the present case is dissimilar from cases where a party is unhappy with finished work, because here the work was not finished but was instead interrupted by an intervening and unexpected explosion. The *Westlake* Court discussed the term occurrence in the context of modern day CGL policies, surmising that "an intentional act resulting in property damage the insured did not expect or intend qualifies as an accident amounting to an occurrence as defined in a modern standard-form CGL policy so long as the insured did not expect and intend both the act itself and the resulting property damage." *Id* at 736. Surely it cannot be argued by either side that West Side intended an explosion to occur in its efforts to salvage grain. Thus, the Court finds that Defendants cannot prevail at the summary judgment phase on their argument that the CGL policy was completely inapplicable to the case before the Court.

Next, RSUI contends that an exclusion to coverage exempts them from liability to West Side, namely—the damage to property exclusion, which exempts from coverage:

(5) that particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) that particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it.

(Doc. 1 at 31). In support of this exclusion eviscerating coverage, RSUI cites *Spirtas Co. v. Nautilus Co.*, 715 F.3d 667 (8th Cir. 2013) and a number of Illinois decisions whereby these very CGL exclusions were interpreted to bar coverage in other cases. In essence, RSUI alleges that this exclusion applies to bar its liability for damage to the grain elevator because the damage was part and parcel of the work being done to remedy the hot bin situation.

Again, the cases cited by Plaintiffs are more persuasive because a reasonable interpretation of the facts could lead to the conclusion that they were not doing any work on the physical structure of the grain elevator itself, but were instead focused solely on handling the material within the bin that caused it to be classified as a 'hot bin.' Work on the bin itself would have fallen within the damage to property exclusion—such as work to physically repair manhole covers or to change the physical characteristics of the bin, whereas work on the contents of the bin would only fall within the damage to property exclusion to the extent the damage sought was for repair or replacement of the actual contents of the bin lost. *See Columbia Mutual Ins. Co. v. Schauf*, 967 S.W.2d 74 (Mo. 1998) (finding that where a painting com-

pressor caused a fire that extensively damaged a home, the CGL damage to property exclusion only applied to the cabinets the sprayer was being used to paint, but did not apply to the rest of the house the cabinets were located in). Here, the claim is for damage to the bin itself, not to the loss of the grain in the bin making it a 'hot bin,' accordingly the Court finds that there is sufficient factual support and argument by the Plaintiffs in support of their interpretation of this exclusion to survive summary judgment.

Finally, the Defendants argue that the coverage exclusion for contractual liability applies to this situation. The contractual liability exclusion in the CGL policy states that " 'bodily injury' or 'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement" is not covered. (Doc. 1 at 28). The case the Defendants cite in support of this argument is an Illinois case, and though it discusses a CGL contractual liability exclusion in the general sense, the court in that case actually declines to determine whether or not the exclusion applies to the facts before it because it found that there was no coverage to begin with in that particular case.

The Plaintiffs identify an Iowa case in support of their argument that the contractual liability exclusion does not apply, but the case does not provide much help as it is a long-winded discussion of insurance coverage in an employment termination context. *See Talen v. Employers Mut. Cas. Co.*, 703 N.W.2d 395 (Iowa 2005). Nevertheless, the case generally supports the Plaintiffs argument that an exception to the exclusion may apply to restore coverage here because the policy provides that coverage will not be excluded for liabilities "the insured would have in the absence of the contract or agreement" that may oth-

erwise give rise to an exclusion. (Doc. 1 at 28); *see generally Talen*, 703 N.W.2d at 401–03. The Defendants anticipated this argument, insisting that it was not viable because the Plaintiffs were not sued in negligence at trial—but that argument is plainly wrong. The Plaintiffs *were* sued in negligence, and the negligence claims survived all the way up until the jury favored the contractual claims over the negligence claims. The policy makes no mention of what may happen in such a situation, and silence of a policy is to be construed against the insurer under Iowa law. Thus, the exception to the contractual liability exclusion provides the Plaintiffs with a viable argument that coverage did exist. *See Westlake*, 880 N.W.2d at 733–34 ("When the language of the policy is ambiguous, we adopt the construction most favorable to the insured.").

The Court's conclusion that coverage may exist, and that an exclusion does not apply, eviscerates the need to consider the Defendant's argument that there could be no bad faith failure to settle in the absence of coverage. Instead, the Court will proceed to examine the parties' arguments regarding the scope of the Defendant's potential duty to settle, and any potential bad faith in doing so. RSUI argues that it did not violate a duty to settle because no firm offer was extended for settlement, or, no settlement with a subset of the plaintiffs in the underlying litigation would have protected West Side from the damages they now seek to recover. West Side retorts that the absence of a firm offer to settle did not free RSUI of a duty to settle, and, as the case progressed towards trial RSUI was presented with multiple opportunities to settle, which became increasingly important as the trial progressed and liability fell more and more heavily on West Side.

Illinois law will be applied to the bad faith allegations in the present case because the underlying conduct related to this tort occurred primarily in Illinois where the original trial occurred.

Under Illinois law, "numerous decisions by [the Illinois Court of Appeals] and the Seventh Circuit Court of Appeals recognize the principle that an insurer must act as a fiduciary to its insured and may not act negligently nor in bad faith towards the best interests of the insured." *Kavanaugh v. Interstate Fire & Cas. Co.*, 35 Ill.App.3d 350, 342 N.E.2d 116, 120 (1975). Though the Illinois Supreme Court has not explicitly delineated the parameters of this duty, many state appellate court decisions give shape to the duty. As a general principle, an insurer cannot be forced to initiate settlement discussions with a plaintiff, however, there is "a well recognized exception to the general principle when the probability of an adverse finding on liability is great and the amount of probable damages would greatly exceed the coverage." *Id.* at 121. In investigating, defending, considering questions of settlement, and on the question of appeal, the insurance company must give the interests of the insured equal consideration with its own interests and it must in all respects deal fairly with the insured. *Cernocky v. Indemnity Ins. Co. of North America*, 69 Ill.App.2d 196, 216 N.E.2d 198, 207–08 (1966).

The mere fact that a case was ultimately lost at trial, to the behest of the insured, nor the insurers refusal to settle, give rise to per se negligence or bad faith. *See Kavanaugh*, 342 N.E.2d at 121. Additionally, the advice of trial counsel for the insured to the insurer that settlement should be accepted or pursued is not controlling in establishing bad faith. *Olympia Fields Country Club v. Bankers Indem. Ins. Co.*, 325 Ill.App. 649, 60 N.E.2d 896, 900 (1945) (hereinafter "*Olympia Fields*"). "And the fact that the insurance company refuses an offer of settlement, contrary to the advice of its trial attorney, with a bad result, is not proof of bad faith on its part. It is merely proof that the judgment of the trial attorney was better than its own as to what would be the final outcome of the case." *Id.* at 900.

Critically for the case before the Court, the Illinois Court of Appeals has held that absent a showing by the plaintiff that the defendant could have ended its potential liability to all relevant parties within policy limits, there is no grounds for a claim that the defendant acted in bad faith. *Sanders v. Standard Mut. Ins. Co.*, 142 Ill.App.3d 1082, 97 Ill.Dec. 258, 492 N.E.2d 917, 918–19 (1986). In the *Sanders* case, the Court of Appeals noted that the impossibility for the insurer of settling all claims within limits between multiple conflicting parties made a claim of bad faith untenable. The *Sanders* Court contrasted the case before it with another case wherein the insurer had received at least one offer to settle from the plaintiff, acknowledged the risk that a verdict in the case would exceed policy limits, and nevertheless proceeded to trial. *Id.*, at 918–19, citing *Edwins v. General Cas. Co. of Wis.*, 78 Ill.App.3d 965, 34 Ill.Dec. 274, 397 N.E.2d 1231 (1979). In *Sanders* the Court found that summary judgment in the insurers favor was appropriate, whereas in *Edwins* the court found that the facts precluded summary judgment in the insurers favor. *See Sanders*, 97 Ill.Dec. 258, 492 N.E.2d at 920; *Edwins*, 34 Ill.Dec. 274, 397 N.E.2d at 1233.

Here, the Plaintiffs have identified a number of Illinois cases exploring the duty of an insurer and the possibility of bad faith or negligence, and some of those cases even resulted in a finding that summary judgment was not appropriate in fa-

vor of an insurer. *See e.g. O'Neill v. Gallant Ins. Co.*, 329 Ill.App.3d 1166, 263 Ill. Dec. 898, 769 N.E.2d 100, 109 (2002) (finding bad faith on behalf of a primary insurer for failing to accept plaintiff's low pretrial offer to settle where everyone but a single insurance adjuster believed settlement was necessary and appropriate); *Smiley v. Manchester Ins. Co. of St. Louis,* 13 Ill.App.3d 809, 301 N.E.2d 19 (1973) (finding that bad faith existed on behalf of an insurer where the depositions and affidavits affirmatively showed bad faith and the only remaining issue was whether the insurer would be liable for its employee's own failure to settle); *Edwins,* 34 Ill.Dec. 274, 397 N.E.2d at 1233 (finding that summary judgment in favor of the insurer was not appropriate where abundant evidence tended to suggest that the insurer had numerous good opportunities to settle on claims it knew exceeded the value of its coverage and yet it refused to do so). However, none of the cases cited explore the notion of bad faith in the context of a commercial general liability policy, and only one of the cases resulted in an affirmative finding of summary judgment against an insured. *See Smiley,* 301 N.E.2d at 19–22.

To distill the applicable Illinois law, an insured must generally establish that the insurer knew claims would exceed the policy limits, that such knowledge overlapped in time with an opportunity to settle the case, that a settlement would have addressed all claims against the insured, and that the insurer nevertheless failed to equally value its own interests and the insured's interests in failing to settle. Two key principles emerge from the numerous cases cited by West Side that are fatal to its ability to overcome summary judgment. First, a number of cases highlight that in order to establish a possibility of bad faith sufficient to overcome

summary judgment, a plaintiff must establish a timeline showing that an insurer's knowledge of the need to attempt settlement and an insurer's opportunities to actually effectuate settlement overlapped such that the insurer had a chance to settle. *See e.g. Ranger Ins. Co. v. Home Indem. Co.*, 741 F.Supp. 716 (N.D. Ill. 1990) (meticulously mapping out the timeframe of potential opportunities for the parties to settle all claims and concluding that there was no clear timeframe where all parties could have reached a settlement); *Adduci v. Vigilant Ins. Co., Inc.,* 98 Ill.App.3d 472, 53 Ill.Dec. 854, 424 N.E.2d 645 (1981). And, second, a plaintiff must establish that when such a moment arose, the opportunity to settle was one that gave the insurer the chance to resolve *all* claims against the insured. *See Sanders,* 97 Ill. Dec. 258, 492 N.E.2d at 918–20. Though Illinois courts appear to frequently defer to jurors on the issue of bad faith or negligence of an insurer, such deference is not warranted here where the Plaintiffs have failed to bring forth evidence that is more than speculative to support the proposition that RSUI acted in bad faith. Most significantly, the Plaintiff's evidence does not establish that RSUI ever had a concrete offer from the plaintiffs and counterclaiming parties in the underlying litigation that would have allowed it to completely settle all claims against West Side within policy limits. The lack of such an offer precludes a finding of bad faith.

The timeline of events that emerges from a close reading of all the evidence submitted by both parties' shows that there was never a concrete moment in time where RSUI both knew of the risk of an excessive burden against the insured and had an opportunity to settle all claims by all parties against the insured. The parties submitted numerous depositions of lawyers involved in the case, as well as email and letter communications that were

exchanged regarding settlement. It is clear from the record that at varying times, each of the parties believed they could and should come to the table to settle the multitude of claims stemming from grain elevator explosion. And, had the parties had the opportunity to do so at a mutual time, bad faith or negligence may have existed on behalf of RSUI. But the fatal flaw in the evidence presented on behalf of the Plaintiffs is that is does not establish beyond a merely speculative level that RSUI ever had a realistic opportunity to settle all claims against West Side within policy limits. Early in the case, and at the initial mediation, the evidence tends to show that the trial counsel for RSUI opined that RSUI was less at fault than other stakeholders. Thus, at that juncture, there was no pronounced need for RSUI to front all of its coverage to settle the case. As negotiations progressed towards trial, that view of the case more or less remained the status quo.

In January of 2012, immediately following the first settlement conference, Con Agra's counsel (Ortlet) sent a letter to ACE's counsel (Moody) demanding that ACE front its full limits of $25 million to attempt to settle the case. (Doc. 56-5 at 41-44). The letter suggested that Ortlet was very concerned about the potential of a high jury verdict in this case, and that it thought settling sooner rather than later would be preferable. But the record does not contain evidence suggesting that ACE actually made its policy limits available at any time prior to its offers to Limber in the midst of the trial. And even then, ACE was not baldly offering its full limits.

As late as March 13, 2012, a letter from John Schultz to Kent Lawson (Colony's counsel) indicates that Schultz does not believe West Side's exposure in the case warranted it contributing the total $12 million of its insurance coverage. (Doc. 36-2 at 101-103). As of March, Schultz advised Lawson that a mediator suggested RSUI contributing $6 million and Con Agra contributing an equal part to settle all claims, but at that time Con Agra expressed no interest or willingness to enter such a deal. (Doc. 36-2 at 101-03).

On April 9, 2012, this Court held a settlement conference in the underlying litigation at which it denied Con Agra's motion for summary judgment and reserved ruling on a number of other issues including some of West Side's motions. Immediately after those rulings, trial counsel for West Side sent a letter to Limber indicating that given the trial court's ruling on Con Agra's motion for summary judgment, West Side was suddenly exposed to a total liability potentially far in excess of his original estimation of $5 million. (Doc. 56-2 at 74-76). On April 10, 2012, West Side's personal counsel (Kevin Visser) sent a letter to Lee Shuman of RSUI, urging Shuman to consider fronting its policy limits to settle the case in light of the recent developments on Con Agra's summary judgment. (Doc. 56-3 at 46-47). Kevin Visser sent another letter to RSUI on April 16, 2012, again demanding that RSUI front its limits towards potential settlement. (Doc. 36-2 at 180-81).

The record does not contain written correspondence aside from these three April communications purporting to show offers being made between any parties from April 9th up until trial. Though Jentz and Schmidt's counsel, Clifford, stated that he would have settled with West Side for $12 million up until the motions in limine were completed and trial began, there is no firm written evidence of any such negotiations. (Doc. 36-2 at 105-116). There is also no indication that such a settlement would have assisted West Side in resolving claims Con Agra had against it. The depositions testimony of some Con Agra representa-

tives (namely Ortlet and Knowles) suggests that Con Agra would have released claims against West Side and RSUI at any time prior to trial, but again there is no documentary evidence that such an offer was actually explicitly extended to West Side or RSUI. The verbal opinions of these attorneys that settlement certainly would have been possible prior to trial does not bring the possibility of settlement beyond a speculative level absent any written documentation whatsoever of settlement negotiations during this pretrial timeframe.

Once trial began, things started to go south when witnesses did not perform as expected. Natalie Limber declared that she does not recall plaintiffs' counsel, Clifford, making an offer to settle once trial commenced. (Doc. 36-2 at 175-177). The evidence shows that West Side's counsel, and all of the other lawyers involved in defending any claims, became nervous as this occurred, and began scrambling to work out a deal. On May 15, 2012, Moody sent a demand to Limber that West Side tender its full limits to settle the Jentz matter, suggesting that Schultz had represented that this would be a satisfactory agreement. (Doc. 56-2 at 70). Limber rejected this overture, indicating that Schultz had no such authority, that she felt some of the evidence at trial was favorable to West Side, and that she would be willing to participate in further settlement. (Doc. 56-2 at 69).

At that point, Con Agra and ACE again approached RSUI with at least two offers to potentially resolve the case. The offers were conveyed via email from Kim Moody to Natalie Limber on May 18, 2012. (Doc. 36-2 at 186). The offers did include a resolution of both the Jentz and Schmidt matters, but refused to move on the Becker matter or workers compensation issues (Doc. 36-2 at 186). On May 22, 2012, Siobhan Murphy wrote Limber conveying a slightly modified offer to settle all of the claims by all three individual plaintiffs against West Side. (Doc. 36-2 at 189). However, the offer still did not cover workers compensation matters, or other liability West Side may be exposed to. (Doc. 36-2 at 189).

RSUI's failure to take either of these offers is not bad faith for at least three reasons. First, as the evidence shows, RSUI believed that neither of the offers completely relieved West Side of all claims against it. Under Illinois law, there is no bad faith if an insurer did not have an opportunity to settle *all claims* against the insured. *See Sanders*, 97 Ill.Dec. 258, 492 N.E.2d at 918–20. Second, Illinois law cited by the parties invokes a duty to negotiate or settle between an insurer and *plaintiffs* in the underlying litigation, but authority is sparse for the notion that an insurer would have any duty to work out a settlement with a co-defendant, or with only one group of plaintiffs. The offers from Con Agra were exactly that—they were offers to resolve a group of claims by Con Agra against West Side, and they were also offers to attempt to resolve claims by the underlying *plaintiffs* thru Con Agra. Thus, rather than being outright approached with a joint settlement offer by the individual injured plaintiffs and Con Agra, the offer only came from Con Agra. As the Defendants argue, the lack of a united front making a settlement offer meant that RSUI had no genuine opportunity to settle all claims against it via these two offers.

What is more, RSUI did not simply ignore the offers and blaze forward with the trial. Instead, RSUI drew up counter-offers and related inquiries by which it endeavored to craft a settlement that would resolve all claims by all parties against West Side. The emails and letters evidencing Limber's attempts to craft a counter-offer belie the notion that RSUI

acted negligently or in bad faith. On May 24, 2012, Limber wrote to Siobhan Murphy that West Side was explicitly willing to tender any amount up to its $12 million dollar limit on a 50/50 sharing basis with Con Agra and ACE to resolve all claims with the exception of the workers compensation issue. (Doc. 56-3 at 26-27). On that same day Murphy responded to Limber by terminating all settlement discussions between RSUI and Con Agra/ACE, stating that it would instead proceed to negotiate with plaintiffs on its own, and with West Side independent of RSUI. (Doc. 56-5 at 27). Murphy's rejection and refusal to work further with RSUI is crucial because this signals that by the middle of the trial a party with claims against West Side was no longer willing to settle. This unwillingness to settle made it impossible for RSUI to effectuate a complete settlement for its insured.

Even in spite of Murphy's unwillingness to negotiate further with RSUI, Limber declared that on May 29, 2012 (the twelfth day of trial), she approached Jentz and Schmidt's counsel and broached the subject of a settlement within RSUI's limits, which Clifford unequivocally rejected. (Doc. 36-2 at 177). Clifford himself also stated in his deposition that once trial commenced, he would not have been willing to accept an unadorned offer of RSUI's $12 million dollar limits. (Doc. 36-2 at 114). Clifford's statement is a second indication that RSUI would have been unable to settle all claims against all parties once the trial was underway.

At bottom, there were too many chefs in the kitchen in this case to allow the parties to cook up a successful settlement. West Side involved its executive Don Voigt, the 'personal counsel' of Kevin Visser, the trial counsel of John Schultz, counsel Kevin Lawson of its primary insurer Colony, and representatives of its excess insurer, including Natalie Limber, Lee Shuman, William Kautter, and Mike Knippen. Con Agra, its co-defendant for a number of the claims, had trial counsel of Joseph Ortlet and John Patton, general representation of Leo Knowles, representation of Siobhan Murphy, and representatives from its insurer ACE, including Kim Moody. Those parties alone, not considering counsel for the plaintiffs in the underlying litigation, included at least a dozen lawyers. It is not hard to imagine how difficult it might have been to reach a last minute settlement agreement satisfactory to this many lawyers with this many competing interests. In fact, the deposition testimony of a number of the lawyers reflects this precise frustration—that in the midst of trial too much was going on between too many people to get a clear picture of the feasibility of a settlement agreement.

Both sides append excerpts of numerous depositions to their respective summary judgment briefs. The depositions are dense, and to be frank, they offer little assistance to the Court in resolving this case because they are depositions of lawyers being deposed, so the answers given to the questions are artfully crafted to duck and weave around lurking legal standards. But the significant takeaway from the depositions is that they do not provide anything more than speculative evidence to support the proposition that RSUI had viable opportunities to settle all claims of this case at any time before or during the trial. By contrast, the emails and letters submitted to the Court demonstrate that key players such as Natalie Limber were working to achieve a settlement. The letters and emails are stronger evidence that the speculative remarks in the depositions because those documents contain a real-time memorialization of the settlement progress before and during trial, whereas all of the deposition testimony is made up primarily of what the deponents recollect

about the trial two or more years after the trial occurred. The difficulty of remembering the specifics of what was done or said before or during trial is evident in nearly every deposition, as many of the deponents explicitly acknowledge that they do not clearly recall the substance of conversations or the primary timing of events.

Instead, many of the deponents constructed their deposition testimony by reference to their typical practices in handling cases, or by reference to what they ultimately think should have occurred in the underlying litigation—namely a settlement. This patchy reconstruction of past events is particularly problematic to the Plaintiffs ability to overcome summary judgment because the timeline of events before and during the underlying trial is of the essence. Bad faith cannot properly lie . against RSUI if in fact RSUI never got the chance to settle all claims against all parties. Noticeably absent from the record is any evidence from Moody or Murphy (the two who appeared to have full settlement authority for Con Agra and ACE) intimating that they would have settled with RSUI at any time before or during the trial. Though the Plaintiffs try to sub in the depositions of Ortlet and Knowles for this possibility, they do not have any evidence that either of these attorneys would have had settlement authority during trial, so their opinions of the ability to settle at that time are of little consequence.

Perhaps the strongest evidence in support of the Plaintiffs case is an email and a letter from Limber to Lee Shuman urging that RSUI should front its policy limits in order to guard against future extra-contractual liability for a bad faith failure to pursue a settlement. (Doc. 56-3 at 29-31). However, the fault of this evidence is that it does nothing to show that such an offer would have in fact resulted in a full release

of claims against West Side. And, what is more, these documents show that members of the RSUI contingency were actively contemplating methods to settle the case during trial—activities which detract from the notion that RSUI acted in bad faith.

Other evidence that Plaintiffs rely heavily on is the pressure from West Side's personal counsel and trial counsel urging RSUI to tender its policy limits during trial. But this evidence is not particularly relevant because a duty to settle is strongest under Illinois law when *plaintiffs* are approaching an insurer with settlement offers, not when other members of the insured's team are urging such a settlement. Plaintiffs also retained an expert, Allan Windt, to assess RSUI's duty to settle the underlying matter, but they do not rely heavily on Windt in their own brief regarding summary judgment. After reviewing the Windt evidence, the Court notes that Windt's opinions appear to place a heavier burden on RSUI to settle than there would be under Illinois law. Thus, the Court does not find the Windt opinion particularly persuasive.

In sum, the record contains evidence that all sides believed settlement was appropriate at some point in time, and the record contains evidence that at some time RSUI became aware that it's insured may be on the hook for more than its policy limits. But the record simply does not contain . sufficient concrete evidence that RSUI acted in bad faith. The outcome of the underlying trial was unfortunate for all of the companies involved, and it does seem that settlement would have been preferable, but for whatever reason settlement simply did not occur. The Court has construed the facts and arguments presented in the light most favorable to the non-movants. In doing so, the Court granted the Plaintiffs broad lenience by constru-

ing the insurance contract in favor of West Side such that coverage may have existed and that exclusions did not bar said coverage. The Court then turned to the issue of bad faith and reviewed a vast amount of evidence including depositions and correspondence. By constructing a timeline of the available evidence, the Court has determined that the evidence does not identify a moment in time when RSUI concurrently knew of the risk to its insured and had an opportunity to settle all claims. Neither further testimony from those already deposed nor new testimony from others involved in the underlying trial would be able to give jurors a reasonable basis to find RSUI liable for bad faith. More testimony would suffer from the same infirmity as the present depositions, in that it would all be constructed from vague recollections of the goings on during the underlying trial—now more than four years ago. Accordingly, the Court finds that construing the evidence in the light most favorable to the non-movants there is not a genuine issue of material fact sufficient to support this case proceeding beyond summary judgment on any issue.

### D. Conclusion

For the foregoing reasons, the Court:

- GRANTS in part and DENIES in part RSUI's Choice of Law Motion, and GRANTS RSUI's Motion for Summary Judgment (Doc. 36);
- DENIES all other pending motions as moot;
- The Clerk of the Court is directed to enter judgment in favor of RSUI.

**IT IS SO ORDERED.**